## STATE PLANTERS BANK & TR CO OF RICHMOND, VA v FIFTH-THIRD UNION TR CO OF CINCINNATI

Ohio Appeals, 1st Dist, Hamilton Co

No 5122. Decided Jan 18, 1937

Wm. J. Rielly, Cincinnati, and Charles P. Taft, Cincinnati, for appellee.

Maxwell & Ramsey, Cincinnati, and Gregor B. Moorman, Cincinnati, for appellant.

## OPINION

By ROSS, J.

This is an action to recover the amount of a check. The appellee—plaintiff—was the drawer drawee of the check. The appellant—defendant— was the bank to whom appellee had paid the amount of the check upon presentment for payment, having received the same from a correspondent bank, to whom it had been transmitted by the paying bank, the indorsements of the payees having been forged.

At the conclusion of the evidence of ap-

pellee the appellant made a motion for an instructed verdict, reserving the right to go to the jury in the event the motion was overruled. The court overruled the motion of the appellant, which then rested. The appellee then made a motion for an instructed verdict, which, over the protest of the appellant, was granted, and special charges tendered by the appellant were refused. Judgment was entered on the verdict so instructed.

If, therefore, under the circumstances there was substantial evidence introduced by the appellee tending to sustain a good defense in law or equity, or no substantial evidence tending to sustain a cause of action, the court was in error, and the judgment must be set aside.

It is alleged in the petition, that:

"There is due plaintiff from defendant as endorser on a bank check dated October 10, 1928, drawn by plaintiff on itself, payable to the order of Frances B. Kinzer, C. S. Kinzer, J. A. Kinzer and H. A. Kinzer, the sum of Two Thousand Three Hundred and Forty-eight and 64/100 ($2,348.64) Dollars, with interest thereon at six (6%) percent per annum from October 18, 1928, a copy of which bank check, with all endorsements thereon, is as follows:

Richmond, Va., Oct. 10, 1928.    No. 4933.
State Planters Bank and Trust Co.    68-2

of Richmond, Va.    5

Pay to the order of Frances B. Kinzer, C. S. Kinzer, J. A. Kinzer and H. A. Kinzer $2348.64.

Exactly Two Thousand Three Hundred Forty eight Dollars Sixty four Cents.

Investment Department

Vouched by          Randolph C. Harrison
E. Ray Burnett          Vice President.

The following are the endorsements on said check:

Frances B. Kinzer
C. S. Kinzer
J. A. Kinzer
H. A. Kinzer
c/o C. S. Kinzer
Pay to the Order of
Any Bank, Banker or Trust Co.
All Prior Endorsements Guaranteed
Oct. 13, 1928
The First National Bank of
Sevierville, Tenn.
Arthur T. Ingle, Cashier.
Pay to the order of
Any Bank, Banker or Trust Co.
Previous Endorsements Guaranteed
Oct. 15, 1928

Holston-Union National Bank
87-50 of Knoxville, Tenn. 87-50
A. Y. Russell, Cashier.
Oct. 17, 1928
Pay to the Order of any
Bank, Banker or Trust Co.
Prior Restrictive
Endorsements Guaranteed
Fifth Third Union Trust Co.
Cincinnati
13-31    Ohio    13-31
Paid through Cincinnati
Clearing House
Fifth Third Union Trust Co."

It is further alleged that such check was delivered by the appellee on October 10, 1928 to The First National Bank of Sevierville, Tennessee, to take up a draft, purporting to have been drawn on appellee by Frances B., C. S., J. A., and H. A Kinzer, and which was presented to appellees for payment on such day; that prior thereto appellee had agreed to make a loan to the payees of the check, to be secured by a mortgage upon real estate situated in Tennessee, owned by such payees, and that the appellee believed said draft to have been drawn by such payees in consummation of such loan to them, that on February 7, 1931, the payees of such check, with the exception of C. S. Kinzer, instituted a suit in chancery in Sevierville, Tennessee, against appellee and the trustee of such mortgage, resulting in a decree finding all of the signatures upon the note, mortgage, and draft to be forgeries, with the exception of the signature of C. S. Kinzer, and the indorsements of the names of the payees upon the check to be forgeries, with the exception of that of C. S Kinzer, and the note, mortgage, draft, and check were held to be inoperative against those whose signatures had been forged by C. S. Kinzer; that appellee first learned of the forgery on January 27, 1931, and until such date believed all such signatures to be genuine; that appellee gave appellant due notice of the filing of such suit, but appellant failed to take any action in connection with such litigation; that the said C. S. Kinzer was decreed in such chancery suit to have a one-third interest in a small strip of ground valued at $150.00.

The prayer of the petition is for judgment for the full amount of the check.

A demurrer filed to the petition was overruled. The appellant then filed an answer in which it denied owing the amount claimed, and admitted the indorsements as alleged, the delivery of the check to the

Sevierville Bank on or about October 10, 1928. for the purpose of taking up the draft mentioned in the petition; that such draft was drawn for the amount of the loan made by appellee to the Kinzers.

Appellant then alleges that the signatures upon the note, mortgage, and draft, and the indorsements upon the check of the names of the Kinzers were all made by the same hand and that all the Banks including appellant, whose indorsement appears upon the check sued upon, were entitled to, and did rely upon the appellees approval of such signatures when such check was accepted for collection, and that appellees recognized and approved such signatures when it honored and paid the check in question, drawn by it upon itself to the order of the Kinzers.

The appellant further alleges that appellee's loss, if any, was due to its reliance upon a forged note, mortgage, and draft, rather than the forged indorsements upon the check.

It is also alleged that by reason of the delay ensuing from the date when such check was paid in October, 1928 until April 1931, the appellant was prejudiced and particularly so, in that, although appellee became aware of such forgery in the summer of 1930, the immediate predecessor bank in indorsement upon the check failed November 11, 1930, and the appellant was precluded from recovery from it.

Appellant further alleges that the appellee failed to assert its rights against the first indorser and paying bank and that it became insolvent, to the detriment of appellant.

A reply was filed in which the appellee denies that the endorsing banks had a right to, or did rely upon the approval of appellee of the forged signatures upon the draft, and it is alleged that such banks, including the appellant, accepted said check unconditionally, and by their indorsements guaranteed all prior indorsements, and it is denied that the appellee recognized and approved as genuine the forged indorsements of the Kinzers upon the check, but, on the contrary, it is alleged that the appellee paid said check in complete reliance upon the guarantee of the appellant bank.

It is further alleged that appellee, although not required to do so did bring suit against the Sevierville Bank, as soon as the signatures were held to be forgeries by the court of chancery, but that before judgment was rendered such bank was placed in the hands of a receiver and judgment was obtained against the receiver for the full amount of the check with interest, that such receiver has paid appellee dividends amounting to $939.44, which should be credited with interest upon the amount claimed to be due from appellant.

Appellee denies it is guilty of any negligence or laches.

The petition in this case is so drawn as to definitely predicate the alleged liability of the appellant upon the statutory liability of an indorser. It is stated **"there is due plaintiff from the defendant as endorsee on a bank check"** a certain sum of money.

In the reply it is stated that the appellee paid said check to appellant in complete reliance upon the guarantee of the appellant bank.

The answer, however, meets the petition not only upon the plane of statutory obligation, but upon the plane of the common law warranty, which it is true is included in the obligation of guarantee imposed by the Negotiable Instruments Law as well as the Law Merchant. This common law warranty that the thing delivered is what it purports to be does not depend upon the act for its recognition, although the warranty and guarantee are both included within the purview of the statutory liability implied from the words commonly constituting a commercial indorsement. Such common law liability would exist even if the act were repealed.

It is also a rule of pleading that except in the case of inconsistency, the pleading must be construed in favor of the pleader. Further, it is the rule in Ohio that the petition may be aided by allegations of the answer. **Union Ins. Co. v McGookey et, 33 Oh St 555; Rheinheimer v Aetna Life Ins Co., 77 Oh St 360, 372; 31 Ohio Jur., 625.** Courts passing upon proceedings in trial courts are also within certain limitations bound to accept the theory upon which the parties in the trial court have proceeded. **Gibbs v Ry. & Power Co., 111 Oh St 498; 2 Ohio Jur., 640, et seq.** In 3 Am. Jur., §830, p. 372, it is stated:

"The well-settled rule which requires the parties to adhere on appeal to the theory upon which they presented the case in the trial court operates to limit the scope of the review, since the authorities are agreed on the proposition that the case, on appeal must be reviewed and decided on the theory

on which it was tried in the court below, and that the theory upon which the case was submitted in the trial court should be treated as the law of the case on appeal. Similarly, on appeal from an intermediate appellate court, the higher court can consider the case only on the theory of the parties in the intermediate court. In determining the theory upon which the case was presented to the trial court, the appellate court will examine the entire record and the briefs of counsel and will construe the pleadings on the theory most clearly outlined by the facts stated and according to their general scope and tenor."

It becomes necessary, therefore, to first determine what contractual or quasi-contractual liabilities exist,

First, by the language:

"Pay to the order of any Bank, Banker or Trust Co."

Second:
"Prior restrictive endorsements guaranteed."

Third:
The common law quasi contractual liability of warranty which exists simply by reason of the delivery of the instrument in exchange for its face value.

This last liability, as heretofore indicated, finds its origin in a source completely independent of the Negotiable Instruments Act. It has been the basis of actions for money had and received. It has been sustained upon the theory of unjust enrichment. We shall consider it in due course.

First then, what are the legal implications of liability to be inferred from the words appearing indorsed upon the check, placed there by appellant:

"Pay to the order of any Bank, Banker or Trust Co?"

**Sec 8168, GC,** provides:
"A person placing his signature upon an instrument otherwise than as maker, drawer or acceptor is deemed to be an indorser, unless he clearly indicates by appropriate words his intention to be bound in some other capacity."

If an indorser would limit the liability, hereinbefore noted, attaching by reason of his signature upon the instrument, he must do so by words clearly indicating a

limitation of that liability. It will not be inferred unless the words appearing in the indorsement clearly require a conclusion of limitation.

"It has been said, under the Negotiable Instrument statute, that when the status of a party who places his name upon the back of a negotiable instrument is under consideration, the tendency of the law is to resolve all doubtful cases towards holding the same to be a commercial indorsement in due course." Daniel on Negotiable Instruments, 7th Ed. Vol. 2, §765, p. 794.

See also: 29 **Ohio Jur.,** pages 1063, 1064; **Bank v Bank, 68 Oh St 43; Dumont v Williamson, 18 Oh St 516; Bank v Bank, 58 Oh St 207.** See: Brannan on Negotiable Instruments, 5th Ed., §63, annotations.

**Sec 8141, GC,** provides:

"An indorsement is restrictive which either:
"(1) Prohibits the further negotiation of the instrument; or
(2) Constitutes the indorsee the agent of the indorser; or
(3) Vests the title in the indorsee in trust for or to the use of some other person.
"But the mere absence of words implying power to negotiate does not make an indorsement restrictive."

The indorsement does not in itself, by its terms, fall within these limitations.

**Sec 8139, GC,** provides in part:

"A special indorsement specifies the person to whom, or to whose order, the instrument is to be payable. The indorsement of such indorsee is necessary to the further negotiation of the instrument."

This section applies to the indorsement in question as far as the designation of indorsee is involved. Otherwise it does not differ from a general indorsement.

So the indorsement in this case must be considered to contain, as far as liability is concerned, the requirements of a general indorsement, this, despite some authorities indicating that such indorsement has been considered a restrictive indorsement. Manifestly, as just stated, it does not come within the limitations mentioned in §8141, GC, describing a restrictive indorsement, but rather under the provisions of §8139, GC, defining a special indorsement. See: 5 R. C. L. 551.

Such being the case, as far as the contract of indorsement is concerned, the provisions of §8171, GC, apply. This section provides:

"Every indorser who indorses without qualification, warrants to all subsequent holders in due course: (Emphasis ours).
"1. The matters and things mentioned in paragraphs numbered one, two and three of the next preceding section.
"2. That the instrument is at the time of his indorsement valid and subsisting.
"In addition, he engages that on due presentment, it shall be accepted and paid or both, as the case may be, according to its tenor, and that if it be dishonored and the necessary proceedings on dishonor be duly taken, he will pay the amount thereof to the holder, or to any subsequent indorser who may be compelled to pay it."

It becomes necessary obviously to determine whether the appellee is a holder in due course. §8157, GC, defines a holder in due course.

"One is a holder in due course who has taken the instrument under the following conditions:
"1. That it is complete and regular upon its face.
"2. That he became the holder of it before it was overdue, and without notice that it previously had been dishonored, if such was the fact.
"3. That he took it in good faith and for value.
"4. That at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it."

And we find the rights of such holder in due course defined by §8162, GC:
"A holder in due course holds the instrument free from any defect of title of prior parties, and free from defenses available to prior parties, among themselves, and may enforce payment of the instrument for its full amount against all parties liable thereon."

The instrument in question is what is commonly known as a check, which is defined by §8290, GC, to be:
"A check is a bill of exchange drawn on a bank payable on demand.   Except as herein otherwise provided, the provisions of this division applicable to a bill of exchange payable on demand apply to a check."

And a bill of exchange is defined in §8231, GC, as:
"A bill of exchange is an unconditional order in writing addressed by one person to another, signed by the person giving it, requiring the person to whom it is addressed to pay on demand or at a fixed or determinable future time a sum certain in money to order or to bearer."

So that the drawee bank of the check has all the privileges and obligations of the drawee of a draft, and cases and authorities considering the status of drawee of drafts, are necessarily pertinent and controlling.

The statutory liability of an indorser, as has been noted, is limited to holders in due course, and if recovery is to be had by virtue of the liability so created by the Negotiable Instruments Act as to indorsers, it will be necessary to establish the character of the appellee as such.

It will be remembered that paragraph 4 of §8157 GC, which defines a holder in due course, provides:

"4. That at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it."

Does the holder upon presenting the check for payment negotiate it, sell it, pass it on in due course?  In 4 Harvard Law Review, p. 302, we find:

"But the attitude of the holder of a bill who presents it for payment is altogether different from that of a vendor. The holder is not a bargainor.  By presentment for payment he does not assert, expressly or by implicating, that the bill is his or that it is genuine.  He, in effect, says: 'Here is a bill, which has come to me, calling by its tentor for payment by you.  I accordingly present it to you for payment, that I may either get the money, or protest it for non-payment.'   Mr. Justice Chambre's statement, that the holder warrants the genuineness of the bill by presenting it, was expressly repudiated by Littledale and Bayley, J. J., in E. I. Co. v Tritton.  The notion, that the holder's indorsement of his name on the bill at the time of payment is a warranty of the genuineness of the bill, although not without judicial sanction, should be strenuously resisted.  The so-call-

ed indorsement is not an indorsement at all, but simply a receipt for payment."

This is a statement by Professor Ames in an article considering the application of the doctrine in Price v Neal, 3 Burr., 1354, hereinafter referred to at great length.

The course of the instrument has ended when it reaches the drawee and is paid. It cannot continue in further negotiation. The holder does not negotiate it, for its negotiation ceases. He does not sell it, for the very character changes as it comes into the possession of the drawee, so that if it could be a sale, the seller would sell one thing and the vendee receives another. A merchant does not sell an account to his debtor when the debt is paid. The transaction in both cases simply constitutes the extinguishment of an obligation. It has none of the characteristics of a sale.

The same conclusion is found in Brannan on Negotiable Instruments, 5th ed., p. 749, 750:

"The statements in American Exch. Nat. Bank v Yorkville Bank, 122 Misc. Rep. 616, 204 N. Y. Supp. 621, affd. by memo., 210 App. Div. 885, 206 N. Y. Supp. 879, and after §198, and Kleinman v Chase Nat. Bank, 124 Misc. Rep. 173, 207 N. Y. Supp. 191, that a collecting bank by indorsing checks and presenting them to a drawee bank for payment, thereby warrants, under §§65, 66, that all prior indorsements are genuine, must be regarded as erroneous. If the collecting bank were a warrantor under these sections, it would also warrant the genuineness of the drawer's signature, which is clearly not the case. The liability of the collecting bank to refund money paid on a forged indorsement rests on §23 and the quasi-contractual duty to return money received under mistake, and not on any warranty, since there is no sale."

In Minneapolis Nat. Bank v Holyoke Nat. Bk., 182 Mass. 130, 134, the court states:

"The underlying question in this case is whether the defendant is liable over to the plaintiff. The first ground on which the plaintiff contends that the defendant is liable over to it is that by indorsing the check, the defendant guaranteed the genuineness of the prior indorsement. But the defendant did not indorse the check in that sence of the word; that is to say, the defendant did not enter into the contract of an indorser of a negotiable bill or note; the defendant did write on the back of the check, 'Pay to any National Bank or order, City National Bank of Holyoke,' and sent the check with that indorsement to the drawee named in the check for payment. This indorsement, if it can be properly called an indorsement, was not a transfer of the check, but was put on it when it was presented for payment. The indorsement of an indorser, using the word in its technical sense, imports a guarantee of previous signatures, because it is a transfer and sale; but an indorsement, which is not made for the purpose of transfer, is not an indorsement within the law merchant, and does not carry with it a guarantee of previous indorsements. See in this connection Dedham National Bank v Everett National Bank, 177 Mass. 392, 394."

While in this case, the holder sent a letter with the check, stating it was for collection and remittance, we do not consider that this factor was controlling in the conclusion of the court.

There being no negotiation, §8170, GC, is inapplicable, the drawee not being a holder in due course, §8171, GC does not apply.

It is our opinion, therefore, that the drawee is not such a holder in due course as will permit it to recover under §62 of the Negotiable Instruments Law (§8167, GC), §63, Negotiable Instruments Law (§8168 GC), §66 of the Negotiable Instruments Law (§8171, GC), or §52 of the Negotiable Instruments Law (§8157, GC).

This disposes of the first contract, claimed to be implied in the indorsement "Pay to the order of any Bank, Banker, or Trust Co."

As to the second contract of guarantee, claimed to exist by virtue of the words "Prior restrictive endorsements guaranteed," it is only necessary to state that the indorsement of the payees' names was not a restrictive indorsement, and, hence, not covered by the words used.

We come now to consider the implied warranty underlying the transactions resulting in delivery of the check to the drawee and payment to the holder.

In this phase of the case, we are compelled to conclude that this litigation is predicated upon the common law action of money had and received, the principle of unjust enrichment. This is distinct from, and not dependent upon the provisions of §§8170, 8171, GC, supra. We have read with much interest the discussion carried on between Professor Ames and Mr. Daniel in Daniel Negotiable Instruments, 3rd ed.

p. 370, 4 Harvard Law Review, p. 301, 53 Central Law Journal, p. 69, 17 Harvard Law Review, p. 580, Daniel Negotiable Instruments, 7th ed. Vol. 3, p. 1655.

It is true this discussion had its original predicate upon the doctrine of Price v Neal, supra, but the reasoning of Professor Ames and Mr. Daniel extends the scope of their conclusions far beyond the limits of a drawee's right to recover for the forgery of the drawer's signature. Even as to this right, it is pointed out by Professor Ames, in 4 Harvard Law Review, p. 298, that this recovery cannot be refused logically; because he was negligent, or because he is conclusively presumed to know the drawer's signature, or is estopped to deny the drawer's signature, or because the holder indorsee, receiving payment, has lost the right of recourse against prior indorsers. The basis for the rule appears in the following statement of Professor Ames, 4 Harvard Law Review, 299:

"The true principle, it is submitted, upon which cases like Price v Neal are to be supported, is that far-reaching principle of natural justice, that as between two persons having equal equities, one of whom must suffer, the legal title shall prevail. The holder of the bill of exchange paid away his money when he bought it; the drawee parted with his money when he took up the bill. Each paid in the belief that the bill was genuine. In point of natural justice they are equally meritorious. But the holder has the legal title to the money. A court of equity (and the action of assumpsit for money had and received is, in substance, a bill-in equity) cannot properly interfere to compel the holder to surrender his legal advantage. The same reasoning applies if the drawee has merely accepted the bill. The legal title to the acceptance is in the holder. A court of equity ought not to restrain the holder by injunction from enforcing his legal right, nor should a court of law permit the acceptor to defeat his acceptance by an equitable defense."

Sec 8128, GC, provides:
"When a signature is forged or made without authority of the person whose signature it purports to be, it is wholly inoperative. No right to retain the instrument, give a discharge therefor, or to enforce its payment against any party thereto, can be acquired through or under such signature, unless the party against whom it is sought to enforce such right is precluded from setting up the forgery or want of authority."

It is to be noted also that under this section no title is conveyed by a forged indorsement, hence, the holder conveys nothing to the drawee in exchange for payment. However, it is indicated that the equities may be unequal even in the case of the forgery of the drawer's signature. On p. 300, of the Harvard Law Review, Vol. 4, it is stated:

"If, indeed, the equities are not equal,—if, for instance, the holder acquired the bill, not in the course of business, but as a gift,—he ought not to be permitted to retain the money paid him by the drawee. This is not a case where one of two innocent persons must suffer a loss in any event. If the money is repaid, neither will suffer a loss. For the holder, although he refund, is not really out of pocket. By refusing to repay, he would be striving unconscientiously to enrich himself by a positive increase of his property at the expense of the drawee.

"Again, the equities might be unequal because of the holder's misconduct. He might have purchased the bill from a stranger, making no inquiries as to his identity or character. Inasmuch as such inquiries would ordinarily disclose the fraud, if any, and prevent its success the holder, who thus carelessly fails to satisfy himself as to the identity and honesty of his transferer, may fairly be held responsible for the consequent loss, which must fall either on the drawee or himself. The general principle and this limitation are forcibly stated by Ranney, J.:—

" 'We have nowhere doubted the wisdom or policy of the rule, which allows an innocent holder to require the drawee to pass upon the signature of the drawer, and makes him responsible for the decision he makes; nor the justice of permitting the former to retain the money received upon a forgery when some one must suffer by the mistake. But we must be better informed than at present, before we shall be able to perceive the justice or propriety of permitting a holder to profit by a mistake which his own negligent disregard of duty has contributed to induce the drawee to commit'."

It is much easier to conceive an inequality of equities in the case of the forgery of the payees' signature, such as here considered. The presence or absence of in-

equalities of equity therefore logically becomes the criterion for recovery or failure to recoup.

The right to maintain such an action, based wholly upon a common law liability to return that which has unjustly enriched the defendant, is recognized in many other authorities. Of course, Mr. Daniel recognizes this right, since he maintains that the drawee has it even in the case of forgery of the drawer's signature.

In Daniel on Negotiable Instruments, 7th ed., p. 1659, §1615, it is stated:

"But the drawee who accepts or pays a bill is never regarded as thereby admitting the genuineness of the signature of an indorser; for although it is true that every indorser is in respect to his liability the same as a new drawer to the bill, yet the acceptor cannot be presumed to have any such knowledge of his signature as he has of the drawer's, and, therefore, he is not presumed to admit it. If the drawee or acceptor of a bill were to pay it, and it turned out that the indorsement of the payee or a special indorsee were forged, the result would be that he could not charge the amount in account against the drawer, and that the payment would be invalid; but as his act implies no admission of the genuineness of the indorser's signature, he could recover back the amount from the holder to whom he paid it. 'Neither acceptance nor payment,' says Cowen, J., in a case cited below, 'at any time nor under any circumstances, is an admission that the first or any other indorser's name is genuine.' The payee or indorsee of a bill, or note, whose signature has been forged to an indorsement upon it, may recover upon it; and such a payee or indorsee of a check paid by a bank upon his forged indorsement may recover the amount of the bank."

In Leather Manufacturers' Bank v Merchants' Bank, 128 U. S. 26, recovery was only denied because of the running of the six year statute of limitations against the implied promise to refund. The syllabus in that case is:

"If a bank, upon which a check is drawn payable to a particular person or order, pays the amount of the check to one presenting it with a forged indorsement of the payee's name, both parties supposing the indorsement to be genuine, a right of action to recover back the money accrues at the date of the payment, and the statute of limitations begins to run from that date."

On page 34 of the opinion the court say: "But as between the bank and the person obtaining money on a forged check or order, the case is quite different. The first step in bringing about the payment is the act of the holder of the check, in assuming and representing himself to have a right, which he has not, to receive the money. One, who, by presenting forged paper to a bank, procures the payment of the amount thereof to him, even if he makes no express warranty, in law represents that the paper is genuine, and, if the payment is made in ignorance of the forgery, is liable to an action by the bank to recover back the money which, in equity and good conscience, has never ceased to be its property. It is not a case in which a consideration, which has once existed, fails by subsequent election or other act of either party, or of a third person; but there is never at any stage of the transaction, any consideration for the payment. Espy v Bank of Cincinnati, 18 Wall. 604; Gurney v Womersley, 4 El. & Bl. 133; Cabot Bank v Morton, 4 Gray 156; Aldrich v Butts, 5 R. I. 218; White v Continental Bank, 64 N. Y. 316."

And, again, on page 38 of the opinion: "In the case at bar, as in the case last cited, the plaintiff's right of action did not depend upon any express promise by the defendant after the discovery of the mistake, or upon any demand by the plaintiff; upon the defendant or by the depositor or any other person upon the plaintiff; but it was to recover back the money, as paid without consideration, and had and received by the defendant to the plaintiff's use. That right accrued at the date of the payment, and was barred by the statute of limitations in six years from that date."

See also Brannan, Negotiable Instruments Law, 5th ed., p. 749, 750, supra, where the same rule is found.

In 29 Ohio. Jur., p. 1060, §305; we find:

"The Negotiable Instruments Act provides that the acceptor admits the existence of the drawer, the genuineness of his signature, and his capacity and authority to draw the instrument. This is but the statutory enactment of a general rule of common law that has long obtained in Ohio.

"It is a general rule, in Ohio, that the drawee of a check, draft, or bill of exchange is conclusively presumed to know the signature of the drawer. And if he

accepts or pays, in the usual course of business, a bill, check, or draft whereon the signature of the drawer is a forgery, he will not be permitted to deny the genuineness of the signature as against a holder thereof without knowledge of the forgery. But the principle which estops the acceptor from denying the drawer's signature does not extend to indorsements, though the drawer's signature and the indorsement are in the same handwriting, and the acceptor may show the indorsement to be forged.

"Under the Negotiable Instruments Act, the acceptor admits the existence of the payee, and his then capacity to indorse."

See also: National Bank of Commerce v First National Bank of Coweta, 152 Pac. 596, where the court sustains recovery both under the Negotiable Instruments Act and at common law.

Also: State v Broadway National Bank, 153 Tenn. 113, 282 SW 194.

American Exch. Nat. Bank v Yorkville Bank, 204 N. Y. S. 621, is another case in which it is stated that recovery may be had under the Negotiable Instruments Law. It is, however, to be noted that the "plaintiff thereupon brought this action to recover the amount of said checks from the defendant bank upon the ground that in view of the forgeries said defendant's warranties of the prior indorsements had been broken and said defendant had no title to the checks and consequently had obtained the money under a mistake of fact."

The court instructed a verdict in favor of plaintiff, appellee, at the conclusion of the evidence of plaintiff, the defendant, appellant, having rested.

If there was any substantial evidence indicating that the equities were not in favor of the plaintiff, the action of the court was not justified.

The defense, as set out in the answer, vigorously charges that the negligence of the drawee was the real, direct cause of the loss. This is as strenuously denied.

Coming then to consider the evidence:—

It appears that James L. Davis was a lawyer at Bristol, Virginia. A loan broker, C. S. Kinzer, lived at Sevierville, Tennessee. His mother lived at Kingsport, Tennessee. Her two sons, brothers of C. S. Kinzer, also resided in the same town.

C. S. Kinzer consulted Davis about a loan and Davis put the application through to appellee, the State-Planters Bank & Trust Company of Richmond, Virginia. After some investigation, the loan was approved. The property offered as security for the loan was in the name of C. S. Kinzer, his mother and his two brothers, and was located at Kingsport, Tennessee.

The notes and mortgage were sent by appellee to Davis for the purpose of having them executed by the Kinzers. Davis, upon receipt of the notes and mortgage forms from the appellee, sent them to C. S. Kinzer, at Sevierville, Tennessee, for execution. They were returned to Davis and the mortgage was found to have been improperly acknowledged. The mortgage was again sent to Kinzer and returned to Davis, satisfactorily executed. Davis was familiar with the relationship of the parties and their interest in the property. C. S. Kinzer was considered thoroughly reliable. Davis had previously loaned him money. Part of the new loan was used to pay loans Davis had made or negotiated for Kinzer. It was understood Davis was to receive a commission for securing the loan, to be paid by the mortgagors.

The note and mortgage were duly transmitted to appellee, who sent Davis a number of drafts covering sundry amounts, including expense, commission to Davis. All of these drafts bore the signatures of all the Kinzers, and were returned to the appellee and duly covered by its checks. The signatures of the mother and two brothers of C. S. Kinzer were forged by him upon the draft, checks, note and mortgage.

Davis has repaid the appellee the amount of the draft so forged, from which he previously received the proceeds, and which were to his order.

The final payment of the loan was covered by a cashier's check of appellee, which took up a draft submitted by appellee, being its own form of instrument. It is this check for $2348.64, which furnished the subject of the present litigation.

From a letter written by Harris, counsel for appellee, to Davis, October 8, 1928, it appears that a draft covering the amount of the check was returned by appellee to Davis, because improperly signed. The names of all of the Kinzers, except C. S. Kinzer, were signed with a "per" signature. Davis was advised that the appellee would be unable to send check covering the draft until signed by all the mortgagors. This unsatisfactory draft was presented to appellee by a clearing bank and was returned through channels.

It appears also that the appellee had received a letter from "one C. L. Thurman," who is not otherwise identified, requesting appellee to wire The First National Bank of Sevierville as soon as the new draft was

approved (the same being enclosed with Thurman's letter) and to state in the wire whether the appellee would honor such second draft. A wire was sent the Sevierville Bank stating that appellee had mailed the check in payment of the draft, which was approved. This wire was sent October 10, 1928. On the same day appellee mailed its cashier's check, the one in question. It is stated in one part of Harris' testimony that this check was sent direct to the Sevierville Bank, and in a letter to the bank, enclosing the check, it was stated that the check could not be made payable to the bank for lack of authority on the part of the mortgagors. Harris states, however, in his evidence:

"Q. I notice that the draft for $2348.64, introduced as Exhibit Harris No. 13, is dated October 3, 1928, whereas the other three drafts were dated respectively, September 20, 1928 as to Exhibit No. 10, and September 24th as to Nos. 11 and 12. Please look at your file and explain that if you can.

"A. The draft that is dated September 20th, 1928 was forwarded to us along with the notes and some other papers. That draft represented the State Planters Bank and Trust Company's fee for making the loan and the cost of title insurance and was sent with the notes and some other papers. The other drafts were sent for collection through regular banking channels. Two of the other drafts were paid when presented but the draft of $2348.64, when first presented, was improperly endorsed and was returned on October 2, 1928, and subsequently a new draft was returned direct to us with the endorsements of all of the payees on the back thereof, and we issued a check payable to the order of all the endorsers on the draft and sent it to our attorney, James L. Davis."

Harris further states that the second approved draft for which the check in question was mailed, was sent back to the bank that forwarded it to appellee. Just how the check came to be paid by the Sevierville Bank, which indorsed it after the forged signatures of the payees, is not clear. It may have been sent by Davis to Kinzer who forged the signatures, presented the check to the bank, which paid it to Kinzer, and returned the draft and paid check through channels to the appellee. The course of the check after payment by the Sevierville Bank was to the Holston-Union National Bank of Knoxville, Tennessee, and thence to the appellant. It was then sent by the appellant to the appellee, who paid it. All banks except appellant guaranteed all prior indorsements without qualification. The appellant indorsed, as previously set forth herein.

For almost three years the incident remained apparently closed. The note then being in arrears for interest, notice was sent by appellee to all four mortgagors when the forgery was then discovered, upon which they disclaimed all signatures on note, mortgage, drafts and indorsements on checks. A suit was filed by those whose names had been so forged, in a chancery court in Tennessee. The appellant was invited by appellee to defend the action, but refused to do so. A decree was entered adjudging the signatures forgeries and vacating the effect of all instruments, as to the complainants in the chancery suit, upon which their names had been forged. Suit was filed by appellee against the Sevierville Bank (paying Bank) but before judgment could be obtained the bank went into the hands of a receiver. Dividends have been paid from time to time by such receiver to appellee. Credit was given in the reply for such dividends. The second bank in the chain also became insolvent. Suit was then filed by appellee against appellant.

The trial court upon this evidence, appellee having moved for an instructed verdict, found as a matter of law that the appellee was entitled to recover against appellant.

Our conclusion is, that the evidence presented issues of fact and **Headnote 10.** cross-inferences that could only properly be passed upon by a jury.

The position of the appellee is, that it had a right to, and did rely entirely upon the warranty and guarantee created by law in the indorsement of appellant. As we have indicated hereinbefore, this position is not tenable. Giving the appellee the fullest leniency of construction in considering the pleadings, we hold it may recover if it be shown that it is inequitable for the appellant to retain money paid to it, if it be also shown that such payment was made under a mistake of fact.

See: §23 of the Negotiable Instruments Law (§8128, GC) supra.

If the signatures of the payees were forgeries and they are admitted to be so, then the appellant could not have collected from the drawee, appellee, unless such drawee

on the other hand was pre-cluded from setting up the forgery. What facts will so preclude the drawee? Facts amounting to waivei, estoppel, or laches.

Both appellant and appellee were equally ignorant of the forgery. Both were mistaken in believing the indorsements of the payees were genuine. Are the equities equal between them? If so, the legal title must prevail. Where one of two innocent parties must suffer, the one who first made it possible for the wrong to be done must suffer the loss. Was Davis the agent of the appellee? Its own witness states in one place that he was. Other evidence justifies an opposite conclusion. Did appellee entrust its agent with the duty of placing the check in proper hands? There is evidence that it did. Other evidence is presented indicating precautionary measures. If it did trust to Davis, is it entirely free from blame in placing the checks, through Davis, in the hands of a forger, even though it and its agent were ignorant of his character as such? Can it rely entirely upon the duty of the paying bank to pay only to the designated payees? It had wired the paying bank that the new draft was satisfactory. Did this approval apply to signatures? It had personally accepted a note and mortgage similarly signed. It may be asked, what could appellee have done to further protect itself? A jury might properly answer by a verdict in its favor—nothing. Is it for a court to furnish the answer? We conclude that it is not in the face of evidence indicating such close equities, and developing facts from which estoppel might properly be inferred.

The facts showing that the drawee is precluded from setting up the forgery which naturally may appear from its own evidence. That it may be the duty of the collecting bank to show this is beside the point. The evidence introduced by the appellee at the trial, while not as clear as might be desired on some points was sufficiently extensive to show in general what occurred. If a jury should conclude from such evidence that appellee was precluded by its acts from setting up the forgery, such verdict would be justified. This, the trial court prevented by instructing a verdict. Although the appellant made a motion also, it reserved the right to go to the jury if the motion was denied. It was also not entitled to an instruction under the circumstances. The quesion really became:—Was the paying bank led astray by the knowl-edge it possessed of the acts of the appellee, and were these acts sufficient to justify a reasonable person in placing confidence in Kinzer and the signatures of the payees evidently presented by him. The evidence upon exactly what occurred in connection with the cashing or crediting the check leaves, it is true, much to be desired. This feature lends itself to enforcing our conclusion that the interests of substantial justice require the granting of a new trial, at which time the issues may properly be presented to a jury under proper instructions, placing the burden upon the appellee to show a payment to appellant under an honest mistake of fact, and upon the appellant to show facts, if any, precluding appellee from setting up the forgeries as a basis for such mistake.

We recognize the anomaly of an action at law containing issues which would more properly be submitted to a chancellor in equity, but the common law has always claimed this action as its own.

The appellant cites **McHenry v Old Citizens National Bank, 85 Oh St 203.** This case contains statements of many of the principles hereinbefore noted. It is, however, easily distinguished from the case at bar, in that payment was made to the identical payee to whom the drawee delivered it. Here there were four payees. It is clear that if delivery had been made to all payees, no fraud would have ensued.

**The Provident Savings Bank & Trust Co. v Fifth-Third Union Trust Co., 43 Oh Ap 533, (13 Abs 598)** a decision of this court is cited. The case involved an action by a drawee bank against a paying bank. One of the signatures of two payees, husband and wife, was forged. The drawee bank paid its depositor, the drawer of the check, voluntarily. The case then resolved itself into a determination of whether there had been a real loss on the part of the drawee plaintiff. This in turn required a determination of whether or not the depositor drawer could have recovered against the drawee depository. Our conclusion was that it could not, in view of the fact that the relationship of depositor and bank is that of debtor and creditor merely. The depositor had personally given the forger the check, payable to himself and wife, taken a note and mortgage, forged similarly to the indorsement on the check. Its loss was clearly due to its own negligence and not to any act of the paying bank.

In the case of **Weisberger Co. v Barberton Svgs. Bank Co., 84 Oh St 21,** the relationship of plaintiff and defendant was

again that of debtor and creditor—depositor and his depository. The negligence of the drawee of the check was again clearly the proximate cause of the loss. The facts easily distinguish the application of the rules of law noted.

The fact that the appellant did not "guarantee all prior indorsements" distinguishes many of the cases cited by appellee. The presence of such a guarantee, which is the usual bank indorsement, renders valueless many authorities involving rights under such an express contract. The fact that it is the usual indorsement also accounts for the few cases appearing in the books considering the rights of the parties under common law rules applicable to the action for money had and received. The recovery in the cases noted by appellee was justified in each case by the contract of guarantee.

Whether the appellee delayed to such an extent as to cause the appellant to lose a favorable position is also a question of fact for the jury.

It is our conclusion that the interests of substantial justice can only be served by remanding the case to the trial court with permission in the parties to properly reframe their pleadings and introduce such evidence as will fully present the issues of fact to a jury.

The judgment is reversed and the cause remanded to the Court of Common Pleas of Hamilton County for a new trial.

TATGENHORST, PJ, and HAMILTON, J, concur.