McCARTHY, LEBIT, CRYSTAL & HAIMAN CO., L.P.A., Appellant,

v.

FIRST UNION MANAGEMENT, INC. et al., Appellees.

[Cite as *McCarthy, Lebit, Crystal & Haiman Co., L.P.A. v. First Union Mgt., Inc.* (1993), 87 Ohio App.3d 613.]

Court of Appeals of Ohio,
Cuyahoga County.

No. 61868.

Decided May 6, 1993.

*Marshall I. Nurenberg,* for appellant.

*James T. Crowley, Keith L. Carson* and *Kathleen B. D'Angelo,* for appellees.

NUGENT, Judge.

This is an appeal from the Cuyahoga County Court of Common Pleas, which granted the motion for summary judgment filed jointly by defendants-appellees

First Union Management, Inc. and First Union Real Estate Equity and Mortgage Investment (collectively, "First Union") against plaintiff-appellant McCarthy, Lebit, Crystal & Haiman Co., L.P.A. ("McCarthy, Lebit").

Pertinent to this appeal, McCarthy, Lebit's amended complaint asserts claims for relief of, among other things,[1] breach of contract and promissory estoppel (first claim for relief), fraud (third claim for relief) and negligent misrepresentation (fourth claim for relief). McCarthy, Lebit's amended complaint generally alleges that First Union, the owner and manager of real property commonly known as 55 Public Square, Cleveland, Ohio (the Illuminating Building), breached an oral lease agreement entered into with McCarthy, Lebit for space in the above premises. In separate answers, both First Union entities denied that an oral lease agreement had been entered into and raised the defense that McCarthy, Lebit's claims were barred by the statute of frauds. Additionally, First Union Management asserted a counterclaim for unpaid operating expenses, which was subsequently dismissed.

On March 25, 1991, First Union moved for summary judgment on McCarthy, Lebit's remaining claims for breach of an oral lease agreement and promissory estoppel, fraud and negligent misrepresentation. McCarthy, Lebit duly opposed First Union's motion. Evidentiary materials submitted in support of and in opposition to First Union's motion indicate that McCarthy, Lebit occupied space in the Illuminating Building since 1961. In 1989, McCarthy, Lebit occupied a total of 9,565 square feet of space under two separate leases, both of which were scheduled to expire on November 1, 1989. Sometime in the spring of 1989, the parties entered into negotiations to renew McCarthy, Lebit's existing space as well as to occupy space being vacated by another tenant ("Sweeney space").

McCarthy, Lebit partners Larry Crystal and Irwin Haiman were appointed by the law firm to negotiate a new lease with First Union for the space then occupied, as well as the Sweeney space which the firm intended to occupy. In preparation for negotiations, Crystal reviewed the existing leases between McCarthy, Lebit and First Union, as well as a lease between another tenant, represented by Crystal, and First Union. Crystal was well aware that each lease contained a legend on its face and on the signature page stating that:

"This Lease is being forwarded for your approval and execution on the understanding that it shall not become effective until it is accepted by the Landlord and its counsel and executed by the Landlord."

---

1. McCarthy, Lebit's other claims for relief were dismissed at various stages throughout the proceedings. Count two, alleging intentional interference with business relationships, was dismissed without prejudice by stipulation of the parties. Count five, alleging conversion for overcharges, was dismissed with prejudice, and count six, alleging mail and wire fraud in violation of Sections 1341 and 1962, Title 18, U.S.Code, was withdrawn.

Crystal, on deposition, stated that the legend meant "exactly what it says."

Subsequently, on April 13, 1988, Crystal and Haiman met with Arthur Roth, then an assistant vice president of leasing at First Union Management, at the offices of McCarthy, Lebit. At that time, Roth was responsible for obtaining new tenants and renewing existing tenants in the Illuminating Building. At that meeting, Crystal informed Roth that McCarthy, Lebit was interested only in a "good deal" because it had received solicitations from other nearby buildings seeking tenants. Roth testified that First Union wanted McCarthy, Lebit to remain in the building because it was a very prestigious law firm and had always paid its rent on time. Roth put forth two proposals: one was a five-year lease renewal at $13 per square foot with an option for another five years at market rates; and the other was a ten-year lease renewal with a base rental rate of $12.50 per square foot for the first five years and $13.50 per square foot for the second five years. Crystal and Haiman both asserted that the parties agreed to the second option and that McCarthy, Lebit would also obtain the adjacent Sweeney space at the same rate that Sweeney was paying until his lease expired. The Sweeney space would be added into the McCarthy, Lebit lease before the date upon which Sweeney was to vacate his space. Both parties agreed to leave open for further discussion the base year (1987 or 1988) and denominator (leased space or leasable space) to be utilized in connection with the escalation clause in any lease that might be entered into. Other provisions for the lease would reflect the standard lease employed in the past by First Union and other tenants in the building. At the conclusion of the meeting, Roth indicated to both Crystal and Haiman that he would need to discuss the deal with his superior at First Union, Dan Nixon. Likewise, Crystal and Haiman indicated that they had to discuss the proposal with their partners. The three men then shook hands to seal the deal.

Following the meeting, Crystal prepared a memorandum to his partners discussing the offer submitted by Roth and discussing the differences between the parties with respect to the base year and leased-vs.-leasable space. That same day, the partners of McCarthy, Lebit met to discuss the proposed lease agreement. They then prepared a wish list which they hoped to have added to the lease. The following day, Haiman and Roth met to discuss the wish list. Roth rejected McCarthy, Lebit's wish list. Subsequently, Haiman informed Roth that McCarthy, Lebit accepted the terms of the agreement reached at the April 13, 1988 meeting. Additionally, Irwin Haiman averred that he and Roth agreed that the base year would be 1988 and that the rent would be determined by calculating on the basis of leasable space as opposed to leased space.

Following this meeting, Roth discussed the entire agreement with his supervisor, Dan Nixon, who approved the deal. Roth then told McCarthy, Lebit that the parties had a deal and that he would begin the paperwork. However, the

paperwork could not be completed at that time because First Union did not know the date upon which the Sweeney space would be available for McCarthy, Lebit's occupancy.

Over the next few months, Haiman repeatedly contacted Roth to determine when a written lease agreement would be prepared. Roth repeatedly indicated that a written lease agreement would be forthcoming and that the only reason for the delay was that First Union was behind in its paperwork. In reliance upon Roth's assurances, McCarthy, Lebit did not look for other space.

As early as July 1989, when George Sirow became Roth's supervisor, Roth knew that First Union did not intend to honor the agreement reached with McCarthy, Lebit and that First Union planned on presenting new terms to the lease agreement as well as represent to McCarthy, Lebit that Roth did not possess authority to bind First Union. However, it was not until August 1989 that Sirow, First Union's vice-president of operations, and Roth requested a meeting with Crystal and Haiman to discuss the lease agreement. At this meeting, Sirow, for the first time, asserted that Roth lacked authority to bind First Union and that the rental price would be increased by three dollars per square foot. McCarthy, Lebit refused to pay this price, did not sign a lease with First Union, and eventually moved their offices from the Illuminating Building.

Finally, Crystal's deposition testimony indicates that he and other attorneys at McCarthy, Lebit represented other tenants of the Illuminating Building in negotiations with First Union. On those occasions, the person with whom the McCarthy, Lebit attorneys dealt was Arthur Roth. Crystal stated that leases orally negotiated with Roth were honored by First Union. Over the years, Roth had developed an expertise in these negotiations and a reputation that his word could be relied upon.

Based on the foregoing, the trial court granted First Union's motion for summary judgment. McCarthy, Lebit timely appeals, raising the following assignments of error:

"I.   The court erred in granting summary judgment to the defendants by finding that the theory of promissory estoppel was not applicable to the evidence.

"II.   The court erred in granting defendants' motion for summary judgment by concluding that there was no evidence to support a jury finding that the defendants were liable for negligent misrepresentation.

"III.   The court erred in granting defendants' motion for summary judgment by finding that a contract was not in existence.

"IV.   The court erred in granting defendants' motion for summary judgment by finding that any oral agreement on the facts of this case was unenforceable under the statute of frauds (Ohio Revised Code Sections 1335.04, 1335.05)."

I

McCarthy, Lebit's first, third and fourth assignments of error are interrelated and will, therefore, be considered jointly. Collectively, McCarthy, Lebit argues the trial court erred in granting First Union's motion for summary judgment. In its first assignment of error, McCarthy, Lebit contends that a material issue of fact exists on its separate claim for relief based on promissory estoppel. In its third and fourth assignments of error, McCarthy, Lebit argues that a material issue of fact exists as to whether an oral lease agreement was established under the facts of the present case and that such agreement was not barred by the statute of frauds under the doctrine of promissory estoppel.

A court reviewing the granting of a summary judgment must follow the standard set forth in Civ.R. 56(C). *Stegawski v. Cleveland Anesthesia Group, Inc.* (1987), 37 Ohio App.3d 78, 523 N.E.2d 902. Civ.R. 56(C) provides that before summary judgment can be granted, it must be determined that "(1) [n]o genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party." *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 472, 364 N.E.2d 267, 274.

In *Viock v. Stowe-Woodward Co.* (1983), 13 Ohio App.3d 7, 14–15, 13 OBR 8, 16, 467 N.E.2d 1378, 1386, the court held in pertinent part that:

"We recognize that summary judgment, pursuant to Civ.R. 56, is a salutary procedure in the administration of justice. It is also, however, a procedure which should be used cautiously and with the utmost care so that a litigant's right to a trial, wherein the evidentiary portion of the litigant's case is presented and developed, is not usurped in the presence of conflicting facts and inferences. * * * It is settled law that '[t]he inferences to be drawn from the underlying facts contained in the affidavits and other exhibits must be viewed in the light most favorable to the party opposing the motion * * *' which party in the instant case is appellant. *Hounshell v. American States Ins. Co.* (1981), 67 Ohio St.2d 427, 433 [21 O.O.3d 267, 271, 424 N.E.2d 311, 314]; see *Far Eastern Textile, Ltd. v. City National Bank & Trust Co.* (S.D.Ohio 1977), 430 F.Supp. 193, 196. It is imperative to remember that the purpose of summary judgment is not to try issues of fact, but rather to determine whether triable issues of fact exist."

The first issue presented by McCarthy, Lebit's appeal is whether a material issue of fact exists concerning McCarthy, Lebit's claim that the parties reached an oral lease agreement. If this court should find that McCarthy, Lebit failed to raise a material issue of fact regarding the existence of an oral lease

agreement, then the issue of the applicability of the statute of frauds barring enforcement of said oral lease agreement would be rendered moot. Moreover, McCarthy, Lebit's claim based on promissory estoppel would also be rendered moot since McCarthy, Lebit's complaint alleges that it detrimentally relied upon the alleged oral lease "to forebear accepting any other offers to lease space." Given the allegations and posture of the present cause of action, it becomes apparent that McCarthy, Lebit's reliance on the doctrine of promissory estoppel is stated as a shield to bar First Union from raising the statute of frauds.[2]

In its legal sense, the word "contract" includes every description of agreement or obligation, whether verbal or written, whereby one party becomes bound to another to pay a sum of money or to perform or omit to do a certain act. *Terex Corp. v. Grim Welding Co.* (1989), 58 Ohio App.3d 80, 568 N.E.2d 739, paragraph one of the syllabus. An enforceable contract may be created where there is an offer by one side, acceptance on the part of the other, and a meeting of the minds as to the essential terms of the agreement. 17 Ohio Jurisprudence 3d (1980), Contracts, Section 17. An essential element needed to form a contract is that the parties must have a distinct and common intention which is communicated by each party to the other. *Noroski v. Fallet* (1982), 2 Ohio St.3d 77, 2 OBR 632, 442 N.E.2d 1302; *Wabash Elevator Co. v. First Natl. Bank* (1872), 23 Ohio St. 311. If the minds of the parties have not met, no contract is formed. *Noroski, supra,* 2 Ohio St.3d at 79, 2 OBR at 633, 442 N.E.2d at 1304.

A contract is binding and enforceable if it encompasses the essential terms of the agreement. *Mr. Mark Corp. v. Rush, Inc.* (1983), 11 Ohio App.3d 167, 11 OBR 259, 464 N.E.2d 586. Minor terms left unresolved do not vitiate an agreement if essential terms have been incorporated into the agreement. *Id.*

This court has previously noted, in *Mr. Mark Corp., supra,* at 169, 11 OBR at 261, 464 N.E.2d at 589–590, that the modern view of contractual certainty is well expressed in Restatement of the Law 2d, Contracts (1981) 92, Section 33:

---

2. In McCarthy, Lebit's first assignment of error, McCarthy, Lebit argues that it asserted a separate claim for relief based on promissory estoppel in count one of its complaint. However, in its brief in opposition to First Union's motion for summary judgment filed with the trial court, McCarthy, Lebit states: "Plaintiff has pled two separate and distinct claims for relief—one in oral contract supported by promissory estoppel; and one in tort for the negligent misrepresentations of defendants." Accordingly, McCarthy, Lebit failed to raise a separate claim for relief for promissory estoppel with the trial court. It is a well established principle of law in Ohio that a party cannot raise new issues for the first time on appeal. *Addyston Village School Dist. Bd. of Edn. v. Nolte Tillar Bros. Constr. Co.* (1943), 71 Ohio App. 469, 26 O.O. 379, 49 N.E.2d 99; *State Planters Bank & Trust Co. v. Fifty–Third Union Trust Co.* (1937), 56 Ohio App. 309, 9 O.O. 297, 10 N.E.2d 935; *Hiller v. Shaw* (1932), 45 Ohio App. 303, 187 N.E. 130. In any event, this court concludes, *infra,* that a separate claim for relief based on promissory estoppel is barred by the statute of frauds.

"(1) Even though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain.

"(2) The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.

"(3) The fact that one or more terms of a proposed bargain are left open or uncertain may show that a manifestation of intention is not intended to be understood as an offer or as an acceptance." See, also, Corbin on Contracts (1963), Section 95.

Comment *a* to Section 33 of the Restatement adds:

"[T]he actions of the parties may show conclusively that they have intended to conclude a binding agreement, even though one or more terms are missing or are left to be agreed upon. In such cases courts endeavor, if possible, to attach a sufficiently definite meaning to the bargain.

"An offer which appears to be indefinite may be given precision by usage or trade or by course of dealing between the parties. Terms may be supplied by factual implication, and in recurring situations the law often supplies a term in the absence of agreement to the contrary. * * * Where the parties have intended to conclude a bargain, uncertainty as to incidental or collateral matters is seldom fatal to the existence of the contract."

Comment *f* to Section 33 notes at 95:

"The more important the uncertainty, the stronger the indication is that the parties do not intend to be bound; minor items are more likely to be left to the option of one of the parties or to what is customary or reasonable."

Further, with respect to the authority of an agent to bind his principal to a lease agreement, we note that:

"The issue here is not actual authority, but, rather, apparent authority or agency by estoppel. The terms are equivalent and based upon the same elements. *Logsdon v. ABCO Construction Co.* (1956), 103 Ohio App. 233 [3 O.O.2d 289, 141 N.E.2d 216]. In *Logsdon,* the court defined apparent authority as follows:

" ' "This authority to act as agent may be conferred if the principal affirmatively or intentionally, or by lack of ordinary care, causes or allows third persons to act on an apparent agency. It is essential that two important facts be clearly established: (1) That the principal held the agent out to the public as possessing sufficient authority to embrace the particular act in question, or knowingly permitted him to act as having such authority, and (2) that the person dealing with the agent knew of the facts and acting in good faith had reason to believe

and did believe that the agent possessed the necessary authority. \* \* \*"' *Id.* at 241–242 [3 O.O.2d at 293–294, 141 N.E.2d at 223]." *Ammerman v. Avis Rent A Car System* (1982), 7 Ohio App.3d 338, 340–341, 7 OBR 436, 438–439, 455 N.E.2d 1041, 1044–1045.

In the present case, the record reveals that McCarthy, Lebit partners Crystal and Haiman met with First Union's vice-president of leasing, Arthur Roth, to negotiate a lease renewal. Roth put forth two lease proposals. Roth, Crystal and Haiman all agreed that McCarthy, Lebit accepted the second option for a ten-year lease renewal with a base rent of $12.50 per square foot for the first five years and $13.50 per square foot for the second five years. Crystal and Haiman both also asserted that McCarthy, Lebit would occupy the Sweeney space at the same rate Sweeney was paying until his lease expired. The Sweeney space would be added into the McCarthy, Lebit lease before the date upon which Sweeney was to vacate his space. Other provisions of the lease would reflect the standard lease used by First Union. Although the base year and denominator were left for further discussion and the parties indicated that approval of their respective partners and/or supervisors was necessary, the three men shook hands to seal the deal. The next day, Haiman presented Roth with a wish list, which Roth rejected. Haiman then informed Roth that McCarthy, Lebit accepted the terms of the agreement reached on April 13, 1988. Haiman, further, averred that an agreement was reached that the base year would be 1988 and that the rent would be determined by calculating on the basis of leasable space as opposed to leased space. In addition, Roth testified that he believed the parties had reached an agreement. Finally, Roth made numerous assurances to Haiman that he would begin the paperwork on the agreement and that a written lease agreement would be forthcoming. These continuous assurances by Roth signified Roth's authoritative position in these negotiations as well as emphasizing that the agreement was completed.

First Union argues that at least three essential and material terms of the alleged oral lease agreement were left unresolved. Consequently, First Union argues there was no meeting of the minds to form an oral lease agreement. Initially, First Union argues that there was no agreement as to which portion of the Sweeney space McCarthy, Lebit was to rent or a date upon which McCarthy, Lebit could occupy said space. However, an examination of the record reveals that McCarthy, Lebit raised a material issue of fact regarding the essential elements of the agreement. The affidavit of Irwin Haiman indicates that McCarthy, Lebit was to lease that portion of the space which included Sweeney's office and a conference room. Moreover, the deposition testimony of Arthur Roth reveals that the lease renewal was to take effect in November 1989 and that the Sweeney space would be added into the McCarthy, Lebit lease before the

date when Sweeney was to vacate his space. Finally, First Union argues that the parties never agreed upon a lease year or a denominator for calculating leasing obligations. However, Haiman's affidavit asserts that the parties agreed that the rental rate would be calculated on a 1988 base year and it would be based on leasable (as opposed to leased) space. Accordingly, we conclude that the evidentiary materials presented by McCarthy, Lebit are sufficient to raise a material issue of fact regarding whether an oral lease agreement was entered. *Wing v. Anchor Media, Ltd. of Texas* (1991), 59 Ohio St.3d 108, 570 N.E.2d 1095. McCarthy, Lebit's third assignment of error is therefore sustained.

Having determined that McCarthy, Lebit raised a material issue of fact regarding the existence of an oral lease agreement, this court must next decide whether, under the present circumstances, Ohio's statute of fraud bars recovery. Ohio has two relevant statutes of frauds. R.C. 1335.05 provides in pertinent part:

"No action shall be brought whereby to charge the defendant, * * * upon a contract of sale of lands, tenements, or hereditaments, or interest in or concerning them, * * * unless the agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith or some other person thereunto by him or her lawfully authorized."

More specifically, R.C. 1335.04 provides:

"No lease, estate, or interest, either of freehold or term of years, or any uncertain interest of, in, or out of lands, tenements, or hereditaments, shall be assigned or granted except by deed, or note in writing, signed by the party assigning or granting it, or his agent thereunto lawfully authorized, by writing, or by act and operation of law."

It is well established in Ohio that courts of equity may bar application of the statute of frauds. For instance, an oral lease will be taken out of the statute of frauds by partial performance. *Egner v. Egner* (1985), 24 Ohio App.3d 171, 24 OBR 261, 493 N.E.2d 999; *Cuvier Press Club v. Fourth & Race St. Assoc.* (1981), 1 Ohio App.3d 30, 1 OBR 150, 439 N.E.2d 443. Further, the statute of frauds may not be interposed in furtherance of fraud. *Manifold v. Schuster* (1990), 67 Ohio App.3d 251, 254, 586 N.E.2d 1142, 1144. The above exceptions to application of the statute of frauds exist in recognition that the historical purpose behind the statute is to prevent the furtherance of fraud. See, *e.g., Manifold, supra; Ayres v. Cook* (1942), 140 Ohio St. 281, 23 O.O. 491, 43 N.E.2d 287; *Wilbur v. Paine* (1824), 1 Ohio St. 251; *Ardinger v. Bell* (App.1934), 17 Ohio Law Abs. 438; and *Tuscarawas S. & L. Co. v. Jarvis* (App.1931), 11 Ohio Law Abs. 357.

To defeat application of the above statutes, McCarthy, Lebit argues that the doctrine of promissory estoppel, as a separate and distinct claim for relief, is not

barred by the statute of frauds (first assignment of error). Additionally, McCarthy, Lebit argues that the doctrine of promissory estoppel, in appropriate circumstances, may estop the opposing party from using the statute to vitiate an otherwise enforceable oral contract (fourth assignment of error).

■ In Ohio, the doctrine of promissory estoppel has been adopted as it is stated in the Restatement of the Law 2d, Contracts (1973), Section 90, which provides:

"A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *McCroskey v. State* (1983), 8 Ohio St.3d 29, 8 OBR 339, 456 N.E.2d 1204; *Talley v. Teamsters Local No. 377* (1976), 48 Ohio St.2d 142, 2 O.O.3d 297, 357 N.E.2d 44. The doctrine of promissory estoppel is also recognized as an exception to the employment-at-will doctrine in employment contract disputes providing for a separate claim for relief and recovery. *Wing, supra; Helmick v. Cincinnati Word Processing, Inc.* (1989), 45 Ohio St.3d 131, 543 N.E.2d 1212; *Mers v. Dispatch Printing Co.* (1985), 19 Ohio St.3d 100, 19 OBR 261, 483 N.E.2d 150.

■ Promissory estoppel may also be used as an equitable doctrine which may be asserted as a separate cause of action based upon a promise which has induced reliance. *R. Renaissance, Inc. v. Rohm & Haas Co.* (S.D.Ohio 1987), 674 F.Supp. 591 (applying Ohio law); and *Allen v. MCI Telecommunications Corp.* (N.D.Ohio 1988), 707 F.Supp. 309 (applying Ohio law).

First Union relies on *Seale v. Citizens S. & L. Assn.* (C.A.6, 1986), 806 F.2d 99 (applying Ohio law) for the proposition that the doctrine of promissory estoppel cannot be used to take a claim for an oral agreement to purchase or lease real estate outside the reach of the statute of frauds. In *Seale,* the Sixth Circuit Court of Appeals noted that:

"Real estate transactions are usually formal undertakings involving significant sums of money. Because they have the potential to affect the actions and interests of third parties, these transactions need to be made public. The statute of frauds is thus necessary:

" 'to ensure that transactions involving a transfer of realty interests are commemorated with sufficient solemnity. A signed writing provides greater assurance that the parties and the public can reliably know when such a transaction occurs. It supports the public policy favoring clarity in determining real estate interests and discourages indefinite or fraudulent claims about such interests.' *North Coast Cookies, Inc. v. Sweet Temptations, Inc.,* 16 Ohio App.3d 342, 348 [16 OBR 391, 397], 476 N.E.2d 388 [395] (1984)." *Seale, supra,* at 104.

The *Seale* court, after placing considerable emphasis on the fact that the Ohio Supreme Court had not given a strong indication of its position on the issue, held that the oral agreement to repurchase the subject real estate was not enforceable because it violated the statute of frauds. *Id.* at 104. Accord *Sandusky Hous. Trust Ltd. Partnership v. Bouman Group* (June 30, 1992), Franklin App. No. 91AP–1249, unreported, 1992 WL 158460; *TransOhio Sav. Bank v. Jones* (Feb. 12, 1992), Lorain App. No. 91CA005128, unreported, 1992 WL 25705; *Nethero v. Poulson* (Aug. 7, 1990), Wayne App. No. 2634, unreported, 1991 WL 150982; and *Leesburg Fed. S. & L. v. Dunlap* (Mar. 28, 1988), Highland App. No. 658, unreported, 1988 WL 35791; *N. Canton Ctr., Inc. v. Fleming Cos., Inc.* (June 19, 1993), Stark App. No. CA–8995, unreported, 1993 WL 35566.

However, the *Seale* court recognized that a number of courts have permitted promissory estoppel in statutes of frauds cases while an apparently equal number of courts have rejected it. *Seale, supra,* 806 F.2d at 103, citing Promissory Estoppel as Basis for Avoidance of Statute of Frauds (1974 & Supp.1986), 56 A.L.R.3d 1037. Moreover, at least one Ohio court of appeals has recognized that a party may rebut or overcome the statute of frauds (R.C. 1335.05) by using the doctrine of promissory estoppel. *Gathagan v. Firestone Tire & Rubber Co.* (1985), 23 Ohio App.3d 16, 23 OBR 49, 490 N.E.2d 923; see, also, *Knowles v. Beverly Ann, Inc.* (Aug. 25, 1975), Geauga App. No. 619, unreported (suggesting that estoppel may take an oral modification of lease agreement out of the statute of frauds). In *Gathagan,* the plaintiff brought a cause of action alleging breach of an alleged oral employment contract. He was awarded $46,870 after a jury trial. Both parties appealed. The Court of Appeals for Summit County reversed the trial court holding that the trial court should have given jury instructions on the statute of frauds (R.C. 1335.05) and on plaintiff's promissory estoppel defense to the statute of frauds. The *Gathagan* court carefully examined Ohio case law and case law from other jurisdictions to hold that the doctrine of promissory estoppel may bar the statute of frauds as a defense to an oral employment contract that would otherwise fall within the statute. *Id.,* 23 Ohio App.3d at 18, 23 OBR at 51, 490 N.E.2d at 925.

Courts outside Ohio have also recognized that in appropriate circumstances, the doctrine of promissory estoppel can bar a statute of frauds defense to an action based on an oral lease agreement. In *Mauala v. Milford Mgt. Corp.* (S.D.N.Y.1983), 559 F.Supp. 1000, a United States district court held that a genuine issue of fact existed to deny defendants' motion for summary judgment on plaintiff's claim for breach of an agreement to enter into a lease on the ground that there was a disputed issue of fact with respect to whether defendants should be estopped from asserting the statute of frauds defense. The court noted that "[a]pplication of [the equitable doctrine of promissory estoppel] is warranted only

where there is (i) a fraudulent oral promise by the defendant; (ii) upon which the plaintiff relies; (iii) by engaging in acts which are 'unequivocally referable' to the oral promise; (iv) resulting in substantial injury * * *." *Id.* at 1004. The court concluded "that there are disputed issues of fact with respect to, *inter alia,* whether defendants falsely and fraudulently represented to plaintiffs that they would deliver a lease for apartment 12A (or whether defendants fraudulently concealed from plaintiffs the fact that the lease had not been approved) and whether plaintiffs suffered substantial injury by relying on this allegedly fraudulent representation." *Id.* Similarly, in the present case, we believe there is a material issue of fact with respect to whether First Union falsely represented to McCarthy, Lebit that they would deliver a written lease (or whether First Union negligently concealed from McCarthy, Lebit the fact that the lease had not been approved by George Sirow) and whether McCarthy, Lebit suffered substantial injury by relying on the negligent misrepresentations.

In *Nicol v. Nelson* (Colo.App.1989), 776 P.2d 1144, the Colorado Court of Appeals held that the plaintiffs were entitled to injunctive relief, enjoining defendant from developing real estate, on their claim based on promissory estoppel and that the defendant was barred by said doctrine from raising a statute of frauds defense. In *Nicol,* the trial court found that plaintiffs purchased their lots only after receiving assurances from the defendant that the adjoining tract of land would remain undeveloped space and that if defendant acquired said land, he would not develop it. After the defendant took steps to develop the property, plaintiffs brought suit seeking injunctive relief. The court in *Nicol* noted that the doctrine of promissory estoppel, as stated in the Restatement of the Law 2d, Contracts, (1973), Section 90(i), is designed to assure fairness in business relationships by protecting one who relies to his detriment on the promise of another. *Id.* at 1146. See, also, *Dunn v. Dunn* (1975), 24 N.C.App. 713, 212 S.E.2d 407 (holding that under the instant circumstances, the defendants were equitably estopped to plead the statute of frauds in defense of plaintiff's action to specifically enforce an oral contract to reconvey land).

Finally, we note that some courts hold that the doctrine of promissory estoppel may be used to preclude the defense of statute of frauds, but only when there has been (1) a misrepresentation that the statute's requirements have been complied with or (2) a promise to make a memorandum of the agreement. See *Johnson v. Gilbert* (App.1980), 127 Ariz. 410, 414, 621 P.2d 916, 920; *Tiffany, Inc. v. W.M.K. Transit Mix, Inc.* (1972), 16 Ariz.App. 415, 493 P.2d 1220; *21 Turtle Creek Square, Ltd. v. New York State Teachers' Retirement Sys.* (C.A.5, 1970), 432 F.2d 64; *"Moore" Burger, Inc. v. Phillips Petroleum Co.* (Tex.1972), 492 S.W.2d 934. Courts which generally adopt this approach recognize the restrictions placed on

the doctrine of promissory estoppel as stated in the Restatement of Contracts 2d (1932), Section 178, Comment *f,* which provides in pertinent part:

"Though there has been no satisfaction of the Statute, an estoppel may preclude objection on that ground * * *. A misrepresentation that there has been such satisfaction if substantial action is taken in reliance on the representation, precludes proof by the party who made the representation that it was false; and a promise to make a memorandum, if similarly relied on, may give rise to an effective promissory estoppel if the Statute would otherwise operate to defraud." See *"Moore" Burger, supra; Rockland Industries, Inc. v. Frank Kasmir Assoc.* (N.D.Tex.1979), 470 F.Supp. 1176; *e.g., John H. Pelt Co., Inc. v. Am. Cas. Co. of Reading* (Tex.App.1974), 513 S.W.2d 128, 131; *Johnson, supra,* 127 Ariz. at 414, 621 P.2d at 920. "This approach has been praised as providing 'a reasonable balance between the two doctrines—encouraging businessmen to reduce their agreements to writing while mitigating the harsh effects which unswerving adherence to the Statute of Frauds might produce.'" *Id.,* 127 Ariz. at 414, 621 P.2d at 920.

■ Based on the foregoing analysis, this court adopts the approach taken by those courts which hold that the doctrine of promissory estoppel may be used to preclude a defense of statute of frauds, but only when there has been (1) a misrepresentation that the statute's requirements have been complied with or (2) a promise to make a memorandum of the agreement. This approach adheres to the equitable doctrine of promissory estoppel as adopted by the Ohio Supreme Court and stated in Restatement 2d of Contracts, Section 90. Additionally, it promotes a balanced approach to encouraging those in business to reduce their agreements to writing and thereby adhering to the policy considerations behind the statute of frauds while at the same time providing a mitigating effect to the harsh application of the statute of frauds and assures fairness in business relationships by protecting one who relies to his detriment on the promise of another.

Under the unique circumstances in the present case, we conclude that McCarthy, Lebit raised a material issue of fact regarding whether the doctrine of promissory estoppel precludes First Union from raising the defense of the statute of frauds. We have previously concluded that a material issue of fact exists as to whether an oral lease agreement exists. We, now, conclude that a material issue of fact exists as to whether First Union, through its agent, Arthur Roth, promised that a written lease agreement would be forthcoming. The record reveals that following the April 13, 1988 meeting, Irwin Haiman repeatedly contacted Arthur Roth to determine when a written lease agreement would be prepared. Both Haiman and Crystal averred that Roth repeatedly indicated that a written lease agreement would be forthcoming. Accordingly, a material issue

of fact exists regarding whether First Union, through its agent Roth, reasonably should have expected McCarthy, Lebit to forbear action in reliance on Roth's representation that a written lease agreement would be forthcoming. Moreover, the instant misrepresentation goes to the issue of whether the statute would be complied with and that a memorandum, *i.e.,* a written lease, would be made. Finally, the record indicates that through past dealings a unique relationship had developed between the attorneys at McCarthy, Lebit and Arthur Roth. Crystal's deposition testimony indicates that the attorneys at McCarthy, Lebit had dealt with Roth in the past and that leases negotiated with Roth were honored by First Union and reduced to writing. The issue of whether McCarthy, Lebit's reliance is sufficient to estop First Union from using the statute of frauds as defense to McCarthy, Lebit's claim based on an oral lease agreement is a question of fact to be decided by the trier of fact. *Gathagan, supra,* paragraph three of the syllabus.

McCarthy, Lebit's first, third and fourth assignments of error are accordingly sustained, and this cause is remanded to the trial court for a jury determination as to whether the doctrine of promissory estoppel bars First Union from asserting the defense of the statute of frauds on McCarthy, Lebit's claim for breach of an alleged oral lease agreement. McCarthy, Lebit's first assignment of error, is overruled but only to the extent that it asserts a separate claim for relief based on promissory estoppel.

## II

In McCarthy, Lebit's second assignment of error, McCarthy, Lebit argues the trial court erred in granting First Union's motion for summary judgment on its claim for negligent misrepresentation.

The elements of negligent misrepresentation were articulated by the Ohio Supreme Court in *Haddon View Invest. Co. v. Coopers & Lybrand* (1982), 70 Ohio St.2d 154, 156, 24 O.O.3d 268, 269, 436 N.E.2d 212, 214, as follows:

"3 Restatement of Torts 2d, 126–127, Section 552, provides in relevant part:

" '(1) One who * * * supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

" '(2) * * * [T]he liability stated in Subsection (1) is limited to loss suffered

" '(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

" '(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.' "

██ McCarthy, Lebit contends that the evidentiary material submitted in opposition to First Union's motion for summary judgment raises a material issue of fact on each element of the tort of negligent misrepresentation. First Union, however, contends that Section 552 does not apply in the present case since McCarthy, Lebit's claim for relief is an attempt to obtain the benefit of the bargain which is expressly precluded by Section 552B, which states:

"(1) The damages recoverable for a negligent misrepresentation are those necessary to compensate the plaintiff for the pecuniary loss to him of which the misrepresentation is a legal cause, including:

"(a) the difference between the value of what he has received in the transaction and its purchase price or other value given for it; and

"(b) pecuniary loss suffered otherwise as a consequence of the plaintiff's reliance upon the misrepresentation.

"(2) The damages recoverable for a negligent misrepresentation do not include the benefit of the plaintiff's contract with the defendant."

First Union further contends that the reason for the exclusion of damages based on the benefit of the bargain is because the claim for negligent misrepresentation is to provide a remedy to third parties to a contract between a professional (such as an architectural firm as in *Haddon View, supra*) and a client where the professional fails to exercise ordinary care in performing his duties to his client.

First Union's arguments are not persuasive in this regard.` First, a reading of the allegations in McCarthy, Lebit's complaint does not support the argument that McCarthy, Lebit seeks the benefit of the bargain. Specifically, McCarthy, Lebit alleged that due to the negligent misrepresentations of First Union through its agent Roth, McCarthy, Lebit was induced to "forebear the opportunity to lease other space in other buildings," thereby incurring "substantial damages." Indeed, McCarthy, Lebit presented the affidavit of Steven W. Joseph, which indicated that comparable commercial space was available in the Public Square and surrounding regions at a rate of $1.50 to $2 less per square foot than what they are presently paying. It is not the benefit of the bargain with First Union which is the measure of damages sought in the instant complaint. Rather, damages are to be measured by comparing their current monthly rental obligations with those which they might have been obligated to pay under a lease in another comparable building which they could have leased but for their reliance on Roth's representations that a written lease agreement was forthcoming to

confirm this oral agreement. This distinction between its rental obligations currently incurred and those which it could have entered into, while similar to damages representing the benefit of the bargain pursuant to the anticipated lease with First Union, are distinct from the benefit of the bargain allegedly entered into with First Union and represent a pecuniary loss which McCarthy, Lebit allegedly incurred.

The distinction between what damages constitute recoverable "pecuniary damages" and nonrecoverable "benefit-of-the-bargain" damages is not an easy one. The issue of damages in a negligent misrepresentation claim was discussed by the Ohio Supreme Court in *Floor Craft Floor Covering, Inc. v. Parma Community Gen. Hosp. Assn.* (1990), 54 Ohio St.3d 1, 560 N.E.2d 206, wherein the court precluded "economic damages" in an action brought by a contractor against an architectural firm which was allegedly negligent in drafting plans and specifications in a construction project absent privity of contract between the plaintiff/contractor and defendant/architectural firm. In holding that 3 Restatement of the Law 2d, Torts (1977) 126–127, Section 552 did not provide recovery for economic damages suffered by third parties not in privity with design professionals, the court explained:

" 'The law of torts is well equipped to offer redress for losses suffered by reason of a "breach of some duty imposed by law to protect the broad interests of social policy." [Citations omitted]. Tort law is not designed, however, to compensate parties for losses suffered as a result of a breach of duties assumed only by agreement. That type of compensation necessitates an analysis of the damages which were within the contemplation of the parties when framing their agreement. It remains the particular province of the law of contracts. * * *

" 'The controlling policy consideration underlying tort law is the safety of persons and property—the protection of persons and property from losses resulting from injury. The controlling policy consideration underlying the law of contracts is the protection of expectations bargained for. If that distinction is kept in mind, the damages claimed in a particular case may more readily be classified between claims for injuries to persons or property on the one hand and economic losses on the other.'

"Therefore, applying the Restatement in this context will encompass liability that is otherwise best suited for contract negotiation and assignment." *Floor Craft Floor Covering, supra,* 54 Ohio St.3d at 7, 560 N.E.2d at 211.

In *Floor Craft,* plaintiffs specifically contracted with the hospital to hold the architects harmless for economic damages arising from the architects' plans and specifications. Moreover, the architects' contract with the hospital contained several provisions to shield the architects from liability from the contractors.

Accordingly, application of the economic loss rule in *Floor Craft* was required to hold the parties to their contract. *Id.* at 7, 560 N.E.2d at 211.

■ Adoption of the "economic loss" rule in *Floor Craft* does not necessarily preclude recovery in the instant case since Section 552 specifically provides that damages for "pecuniary loss" are recoverable for negligent misrepresentations made by those who have a pecuniary interest in a transaction. Aside from *Floor Craft*, no further Ohio cases discuss the applicable damages recoverable in a negligent misrepresentation claim. However, cases outside Ohio appear to adopt two separate theories of recovery. Courts which apply the economic loss rule to preclude recovery in a misrepresentation claim do so in a very narrow context. These courts hold that the economic loss rule does not apply (1) where one intentionally makes false representations, and (2) where one in the business of supplying information for the guidance of others makes negligent representations. See *Moorman Mfg. Co. v. Natl. Tank Co.* (1982), 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443. With respect to the second exception, such persons usually include attorneys, abstractors of title, surveyors, inspectors of good, operators of ticker services, and banks dealing with non-depositors' checks. *Palco Linings, Inc. v. Pavex, Inc.* (M.D.Pa.1990), 755 F.Supp. 1269. See, also, *Delman v. Cleveland Hts.* (1989), 41 Ohio St.3d 1, 534 N.E.2d 835 (negligent misrepresentation claim rejected as to municipality and its employees in conducting point of sale inspections of real estate); *Floor Craft, supra* (discussing architect's liability for negligent misrepresentation); *Haddon View, supra* (discussing accountant's liability for negligent misrepresentation); *Harrell v. Crystal* (1992), 81 Ohio App.3d 515, 611 N.E.2d 908 (attorneys); *Perpetual Fed. S. & L. Assn. v. Porter & Peck, Inc.* (1992), 80 Ohio App.3d 569, 609 N.E.2d 1324 (real estate appraisers); see, e.g., *Doe v. Blue Cross/Blue Shield of Ohio* (1992), 71 Ohio App.3d 369, 607 N.E.2d 492; *Ziss Bros. Constr. Co. v. TransOhio Sav. Bank* (June 20, 1991), Cuyahoga App. No. 58787, unreported, 1991 WL 118058 (rejecting claim against bank for allegedly failing to properly qualify purchasers of a home); *Goens v. Torco Cos.* (Jan. 22, 1990), Butler App. No. CA89–06–092, unreported, 1990 WL 4259 (termite inspectors); *Kilburn v. Becker* (1990), 60 Ohio App.3d 144, 573 N.E.2d 1226 (insurance agent); and see, e.g., *Dayton–Walther Corp. v. Kelly* (1987), 42 Ohio App.3d 184, 537 N.E.2d 682. The second exception was even more narrowly construed in *Hi–Grade Cleaners, Inc. v. Am. Permac, Inc.* (N.D.Ill.1982), 561 F.Supp. 643, where the court held that "tort claims based upon negligent misrepresentation are limited to those in the business of selling information which their customers might rely upon in taking some additional action." *Id.* at 644. See, also, *Palco Linings, Inc., supra,* 755 F.Supp. 1269, for a discussion of the economic loss rule.

However, those courts which apply the economic loss rule to bar recovery in tort claims for negligent misrepresentation fail to take into account the express wording of Section 552, which provides that "one who, * * * in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information * * *." The above strict and narrow interpretation of the tort of negligent misrepresentation fails to take into account those circumstances where the supplier of false information has a pecuniary interest in the transaction at hand and also fails to realize that "pecuniary loss" is by its very definition "economic loss." See Black's Law Dictionary (6 Ed.1990) 1131; see, also, *Harrell, supra*, 81 Ohio App.3d at 523, 611 N.E.2d at 913, recognizing recovery for pecuniary damages.

Other jurisdictions dealing with cases more on point to the present case adopt a rule allowing for "out-of-pocket" losses, but precluding recovery for damages representing the benefit-of-the-bargain pursuant to Section 552B. See *Frame v. Boatmen's Bank of Concord Village* (Mo.App.1989), 782 S.W.2d 117; *First Interstate Bank of Gallup v. Foutz* (1988), 107 N.M. 749, 764 P.2d 1307; *Anzalone v. Strand* (1982), 14 Mass.App. 45, 436 N.E.2d 960; *Onita Pacific v. Trustees of Bronson* (1990), 104 Ore.App. 696, 803 P.2d 756; *Coastal (Bermuda) Ltd. v. E.W. Saybolt & Co., Inc.* (C.A.5, 1987), 826 F.2d 424; *Mammas v. Oro Valley Townhouses, Inc.* (App.1981), 131 Ariz. 121, 638 P.2d 1367.

In *Frame, supra*, the Missouri Court of Appeals reversed a summary judgment entered in favor of the defendants upon plaintiff's claim for negligent misrepresentation based on facts very similar to those in the present case. In *Frame*, the plaintiff entered into a sales contract for the purchase of a bowling alley. The contract was contingent upon plaintiff's obtaining financing. Plaintiff met with the vice-president of the Boatmen's Bank, Mark Murray, who informed plaintiff that Boatmen's was willing to lend eighty percent of the appraised value or the sales price, whichever was lower. Because the appraisal was not to be completed until after the financing contingency date set forth in the purchase agreement, plaintiff contacted Murray and informed Murray that he was risking $20,000 in earnest money and requested assurances that Boatmen's would loan him the money. According to plaintiff, Murray responded affirmatively. However, Boatmen's later rejected plaintiff's loan application, and plaintiff lost $5,000 earnest money. The trial court entered summary judgment in favor of the defendants, and the court of appeals reversed, finding that plaintiff raised a material issue of fact on his negligent misrepresentation claim. The court applied Restatement of the Law 2d, Torts, Section 552(1) as a prima facie case of negligent misrepresentation. The court recognized that the Boatmen's Bank is in the business of

making loans, and its vice-president supplied plaintiff with loan information. Boatmen's pecuniary interest was self-evident. Moreover, the court wrote "in making the statement that the loan would be forthcoming, Murray intentionally provided that information to appellant [plaintiff] for guidance, knowing that appellant would rely upon Murray's statement in deciding whether to remove the financing contingency. The financing contingency was removed and appellant suffered a pecuniary loss by having his earnest money forfeited." *Id.*, 782 S.W.2d at 122. The court also rejected defendant's claim that plaintiff could not have justifiably relied upon Murray's oral representation that the loan was forthcoming because the oral loan agreement was unenforceable pursuant to the statute of frauds. The court rejected this argument, noting that the reasonableness of plaintiff's reliance is normally a question of fact for the jury. *Id.* at 123–124.

In the present case, it is undisputed that First Union is in the business of renting commercial real estate and that its agent, Arthur Roth, supplied McCarthy, Lebit with false information. Moreover, First Union's pecuniary interest in the above transaction is self-evident. Further, it is our opinion that a material issue of fact exists with respect to whether Roth's representations that the paperwork was being completed and a written lease agreement was forthcoming was made knowing that McCarthy, Lebit would rely upon it in deciding to forgo the opportunity to pursue other leasing options. Finally, whether McCarthy, Lebit justifiably relied upon Roth's representations should also be left for the jury's determination. *Gathagan, supra,* at paragraph three of the syllabus.

The issue of damages was further explored by the appellate court in *Frame v. Boatmen's Bank of Concord Village* (Mo.App.1992), 824 S.W.2d 491 ("*Frame II*"). On remand, the trial court awarded plaintiff $4,300, representing plaintiff's lost earnest money deposit paid to the prospective seller of the bowling alley. Frame appealed, urging he was entitled to recover lost profits. The court of appeals rejected Frame's argument, citing to the Restatement of the Law 2d, Torts, Section 552B, as prohibiting "benefit-of-the-bargain" damages. The court in *Frame II* limited Frame to consequential damages as represented by his lost earnest deposit money. *Id.* at 495–497.

In the present case, McCarthy, Lebit's damages, as alleged in its complaint, are limited to its forbearance of pursuing other leasing opportunities in other office buildings. While the difference between these damages and damages based upon the benefit of the bargain allegedly entered into with First Union may be slight, there still exists a distinction as previously explained, and these differences should not prevent recovery in the present case if a jury determines that McCarthy, Lebit has proven its claim for negligent misrepresentation.

Accordingly, this court rejects First Union's argument that McCarthy, Lebit is precluded from recovery under Section 552B based on the contention that its claim is really a claim for benefit-of-the-bargain damages.

■ First Union's second argument that Section 552 allows recovery only for third parties is also without merit. While the Ohio Supreme Court has addressed the issue of a defendant's liability to a third party for negligent misrepresentations, see *Haddon View, Floor Craft* and *Delman, supra,* it has never limited a negligent misrepresentation claim to third parties only. In fact, Section 552, itself, does not limit its application to third parties. Rather, it states "one who * * * supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information * * *." Thus, while Section 552 can be applied to third parties, it is clearly not limited to third parties. Finally, the cases previously cited apply Section 552 to parties directly related to each other pursuant to contract negotiations.

Accordingly, this court finds that a material issue of fact exists as to McCarthy, Lebit's claim for negligent misrepresentation. McCarthy, Lebit's second assignment of error is well taken.

The judgment of the trial court is reversed, and this cause is remanded to the trial court on McCarthy, Lebit's second, third and fourth assignments of error. On remand, McCarthy, Lebit must show by a preponderance of the evidence that an oral lease agreement was entered into. In addition, McCarthy, Lebit must demonstrate by a preponderance of the evidence that the doctrine of promissory estoppel bars application of the statute of frauds. McCarthy, Lebit's claim for negligent misrepresentation is limited to "out-of-pocket" losses. Finally, to the extent that McCarthy, Lebit may recover damages under its claim for breach of an oral lease agreement, such damages cannot be duplicative of those damages recoverable under its negligent misrepresentation claim.

*Judgment accordingly.*

BLACKMON, J., concurs.

JOHN F. CORRIGAN, P.J., dissents.

JOHN F. CORRIGAN, Presiding Judge, dissenting.

I respectfully dissent from the judgment rendered by the majority.

With respect to the firm's breach of contract claim, it must be noted that the parties' oral agreement may constitute an express agreement. *Lucas v. Costantini* (1983), 13 Ohio App.3d 367, 368, 13 OBR 449, 450, 469 N.E.2d 927, 928. An express contract, unlike an implied contract, connotes a formal exchange of

promises when the parties have communicated in some manner the terms to which they agree to be bound. *Id.* at 369, 13 OBR at 451, 469 N.E.2d at 929. However, the court will give effect to the manifest intent of the parties where there is clear evidence demonstrating that the parties did not intend to be bound by the terms of an agreement until formalized on a written document and signed by both. *Richard A. Berjian, D.O., Inc. v. Ohio Bell Tel. Co.* (1978), 54 Ohio St.2d 147, 151, 8 O.O.3d 149, 151, 375 N.E.2d 410, 413.

Further, with respect to the authority of an agent to bind his principal to a lease agreement, it is essential that two facts be clearly established:

"(1) that the principal held the agent out to the public as possessing sufficient authority to embrace the particular act in question, or knowingly permitted him to act as having such authority, and (2) that the person dealing with the agent knew of the facts and acting in good faith had reason to believe and did believe that the agent possessed the necessary authority. * * *" *Ammerman v. Avis Rent A Car System* (1982), 7 Ohio App.3d 338, 340–341, 7 OBR 436, 438–439, 455 N.E.2d 1041, 1045.

In this case, the majority asserts that Crystal's deposition demonstrates that Roth orally negotiated leases which were honored by First Union and that Roth developed "expertise" and "a reputation that his word would be relied upon." Crystal's actual statements, however indicate that Crystal was familiar with the legend on First Union's proposed leases which indicated that the lease was not effective until accepted and executed by the landlord, and he continued to negotiate changes on behalf of the tenant even after a written, proposed lease was submitted to him. In addition, when Crystal and Haiman left the meeting at issue here, they stated that they needed to review the plan with their partners, and that it was subject to the partners' approval. Crystal likewise admitted that Roth indicated that he had to discuss some of the points with his superiors and that First Union's attorneys were to prepare a written lease for the parties.

Haiman's affidavit similarly acknowledges that he presented the substance of the terms announced by Roth to his partners for their agreement and that the parties intended that a written lease was to be prepared.

Finally, Roth stated that as a "disclaimer," he told Crystal and Haiman that the deal had to be approved by his superiors, and that there were in fact three separate entities which had to approve the deal in writing on a lease deal sheet.

Thus, oral leases were clearly not negotiated and neither Roth nor Crystal and Haiman could bind the parties absent approval from their principals. Accordingly, I would find that the firm's claim that it had an oral contract is unsupportable as the firm and First Union clearly did not intend to be bound until a written lease was prepared and executed. Moreover, Roth lacked actual and apparent

authority to bind First Union as he told Crystal and Haiman that he needed his superiors' approval and they therefore could not reasonably believe that Roth could bind First Union on the basis of his word alone.

Moreover, where the evidence is uncontroverted that no written lease, or memorandum thereof was ever executed, any oral agreement by the parties is properly held unenforceable. *Manifold v. Schuster* (1990), 67 Ohio App.3d 251, 254, 586 N.E.2d 1142, 1144.

A lease will be taken out of the statute of frauds by partial performance. See, *e.g.*, *Delfino v. Paul Davies Chevrolet, Inc.* (1965), 2 Ohio St.2d 282, 286, 31 O.O.2d 557, 559, 209 N.E.2d 194, 197, and the statute of frauds may not be interposed in furtherance of fraud. *Marion Credit Assn. v. Cochran* (1988), 40 Ohio St.3d 265, 533 N.E.2d 325, paragraph two of the syllabus. The firm also cites authority for the proposition that, in an employment context, promissory estoppel may be asserted in opposition to the defense that a contract is unenforceable pursuant to the statute of frauds. See, *e.g.*, *Gathagan v. Firestone Tire & Rubber Co.* (1985), 23 Ohio App.3d 16, 18, 23 OBR 49, 51, 490 N.E.2d 923, 925. Estoppel was rejected as a bar to the statute of frauds in cases involving real estate, however, in *Leesburg Fed. S. & L. v. Dunlap* (Mar. 28, 1988), Highland App. No. 658, unreported, 1988 WL 35791. The court stated:

"In *Seale v. Citizens Savings and Loan Assn.* (C.A. 6, 1986), 806 F.2d 99, 102–104, the court held the doctrine of promissory estoppel should not apply to statute of frauds cases involving real estate. The court, noting the *Gathagan* case involved an alleged employment contract, conjectured that our state courts would not allow promissory estoppel to defeat the statute of frauds in cases involving real estate:

" 'We do not find this Court of Appeals decision to be persuasive authority for the proposition that the Supreme Court of Ohio would allow promissory estoppel to defeat the statute of frauds in a real estate context, however. *Gathagan* involved a breach of an oral contract for employment for two years. We are not convinced that the Ohio courts would treat employment contracts and real estate transactions as co-extensive, since the latter implicate interests that are generally regarded as more deserving of protection.

" 'Real estate transactions are usually formal undertakings involving significant sums of money.'

"The *Seale* court further wrote:

" 'If a court allows parol evidence of an unwritten contract, it can never be certain that it is not perpetuating rather than preventing a fraud. Had the agreement been reduced to writing, however, there would be little opportunity for fraud or mistake to arise.'

"We agree with the reasoning of the *Seale* court and we decline to apply the *Gathagan* case to cases involving real estate. Accordingly, we find no issue of fact concerning whether appellee should be equitably estopped from asserting the statute of frauds in the case at bar."

I would apply the rationale set forth in *Seale v. Citizens S. & L. Assn., supra*, expressly adopted by the Highland County Court of Appeals, and would not allow the promissory estoppel claim to defeat application of the statute of frauds.

Finally, as to the claim for negligent misrepresentation, I would conclude that, assuming such a claim may defeat application of the defense of the statute of frauds in a case such as this where a written lease is contemplated, the firm presented no evidence that anyone at First Union ever represented that Roth could bind First Union by an oral statement. Moreover, even assuming such a representation had been made, since the parties contemplated execution of a written lease and further negotiations, the firm could not justifiably rely upon such representation.

I would therefore overrule each of the assigned errors and affirm the judgment rendered below.