DECISION
This case involves an alleged contract and a "course of dealing" between parties who were under differing impressions about the terms of their agreement, and perhaps even the nature of their relationship. The trial court granted summary judgment for the plaintiff-appellee. Without accepting the trial court's rationale, we affirm. We told the parties after oral argument that we would try "to figure the case out." We have tried.
 I. The Parties
Appellee Super Food Services, Inc., (Super Food) is a wholesaler that provides groceries and other items to grocery stores. Appellants are Munafo, Inc., and its wholly-owned subsidiaries, Bethel Foods, Inc., and Thernick, Inc. (Collectively, these entities will be referred to as "Munafo.") Munafo, Inc., owns a grocery store in West Chester, Ohio; Bethel, Inc., owns a grocery store in Bethel, Ohio; and Thernick, Inc., owns a grocery store in Carlisle, Ohio. Munafo is owned by the Munafo family, which consists of a mother and seven siblings. Super Food has the right to sublicense certain IGA trademarks and trade names. The Munafo stores were, until recently, IGA grocery stores that received the majority of their groceries and products from Super Food's Cincinnati Division. As part of the IGA program provided through Super Food, Munafo also had access to a consolidated advertising program, use of the IGA trademarks and trade name, business counseling, central billing, and IGA-labeled groceries and products.
The predecessor of Super Food's Cincinnati Division was a cooperative known as Parkview Markets, Inc., which was operated primarily by Charlie Arrighi. Munafo first became a cooperative member of Parkview in the early 1970s, when Nicholas Munafo, Sr., and Arrighi established a relationship between the two entities. In 1979, Parkview members voted to merge Parkview with Super Food. In return, the members exchanged their shares in Parkview for shares of the publicly traded Super Food stock. At that time, Parkview became Super Food, Cincinnati Division. Sometime afterward, Arrighi and Munafo, Sr., died. Munafo and Super Food continued to do business until Munafo terminated its relationship with Super Food, left the IGA family, and began purchasing groceries and products from a different wholesaler.
 II. Procedural History
After the relationship ended, Super Food sued Munafo for money due on an account held in the West Chester store's name, breach of contract, and unjust enrichment. Munafo answered and filed four counterclaims against Super Food and a third-party claim against Nash Finch Company, which had become the corporate parent of Super Food in 1997. (The trial court dismissed the third-party claim against Nash Finch. The parties submitted an agreed order adding Bethel Foods, Inc., and Thernick, Inc., as counterclaim plaintiffs. Super Food then dismissed its claims against Munafo without prejudice.)
In its counterclaims, Munafo contended that Super Food had breached an oral contract, had breached its fiduciary duty based on agency principles, had been unjustly enriched, and had engaged in fraud.
Super Food filed a summary-judgment motion. The trial court granted summary judgment on the agency claim because Munafo conceded that summary judgment was well taken on that claim. But it denied summary judgment on the remaining claims, concluding that the evidence required credibility determinations that could only be made in a trial.
After conducting further discovery, Super Food filed a second summary-judgment motion. In that motion, Super Food argued that Munafo had failed as a matter of law to prove the existence of an oral contract, and that even if such a contract had existed, the undisputed evidence demonstrated that the parties' course of conduct had "waived" the contract's terms. To support its motion, Super Food offered, in part, affidavits and deposition testimony from members of the Munafo family, previous Parkview employees, and current Super Food employees. While Super Food acknowledged written agreements between Super Food, the Bethel store, and the Carlisle store, it argued that, for the purposes of its summary-judgment motion, those written contracts did not need to be considered. (This was because a ruling in favor of Super Food on its summary-judgment motion would apply to all three stores.)
Munafo argued in its opposing memorandum that an oral contract existed between Munafo and Super Food, and that the contract obligated Super Food to continue to operate as Parkview by (1) supplying groceries and products on a "cost plus" basis, (2) obtaining the best prices on groceries and products from manufacturers and vendors, and (3) charging Munafo a delivery fee no higher than any other area IGA store.
According to Munafo, Super Food agreed (because Parkview previously had done so) to sell groceries and other products to Munafo at an invoice price that reflected all manufacturer/vendor rebates, allowances and discounts provided to Super Food, plus a delivery charge of a certain percentage of the entire invoice price. It further contended that supplying groceries and products on a "cost plus" basis obligated Super Food to "pass through" to Munafo any monies, rebates, discounts, or allowances provided to Super Food by a manufacturer/vendor as advertising payments.
The trial court granted summary judgment in favor of Super Food. It found persuasive Super Food's argument that, even if an oral agreement existed, Munafo and Super Food's course of dealing had waived the contractual rights asserted by Munafo. It concluded that the evidence was undisputed that Munafo was aware that Super Food had been keeping the contested vendor monies for a decade and that, with that knowledge, it had continued to do business with Super Food.
In its appeal, Munafo challenges the summary judgment granted in favor of Super Food. It argues that genuine issues of material fact exist as to Munafo's breach-of-contract, fraud, and unjust-enrichment claims.
 III. Standard of Review
Under Civ.R. 56(C), "a motion for summary judgment is to be granted only when no genuine issue of material fact remains to be litigated, the moving party is entitled to judgment as a matter of law, and it appears from the evidence that reasonable minds can come to but one conclusion, and, with the evidence construed most strongly in favor of the nonmoving party, that conclusion is adverse to that party."[1] It is the moving party that "bears the initial burden of identifying parts of the record that demonstrate the absence of a genuine issue of material fact. When the moving party meets the burden, the nonmoving party must produce evidence on the issues for which it will bear the burden of production at trial."[2] "The mere existence of factual disputes between the parties does not, however, preclude summary judgment."[3] "The dispute must be over a material fact." (Emphasis sic.)[4] "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted."[5]
We review the trial court's decision de novo.[6] This means that we "independently review the record to determine if summary judgment was appropriate" and that we need not "defer to the trial court's decision* * * *."[7]
 IV. Contract Requirements
Munafo claims that the parties entered into an oral contract. A contract is defined in this manner:
 [It] includes every description of agreement or obligation, whether verbal or written, whereby one party becomes bound to another to pay a sum of money or to perform or omit to do a certain act. [Citation deleted.] An enforceable contract may be created where there is an offer by one side, acceptance on the part of the other, and a meeting of the minds as to the essential terms of the contract. [Citation deleted.] An essential element needed to form a contract is that the parties must have a distinct and common intention that is communicated by each party to the other. [Citation deleted.] If the minds of the parties have not met, no contract is formed. [Citation deleted.][8]
A "meeting of the minds" is the manifestation of mutual assent by the parties.[9] "There is no manifestation of mutual assent to an exchange if the parties attach materially different meanings to their manifestations and (a) neither party knows or has reason to know the meaning attached by the other * * *."[10]
The agreement, according to Munafo, was based on representations by Super Food's authorized representatives that Super Food would continue doing business in the same manner as Parkview had, the course of conduct between Super Food and Munafo, and standards within the food-distribution and grocery industry. The main point of contention is whether Super Food agreed to pass on to Munafo all rebates, allowances, discounts, and the like provided to it by manufacturers, vendors, and brokers ("vendor monies"). This point relates both to the price Super Food charged Munafo for groceries and products it warehoused and delivered to Munafo, and to items that Super Food featured in IGA fliers and newspaper advertisements, for which manufacturers, vendors, or brokers paid or rebated money to Super Food ("advertising monies").
 V. Super Food Employees
Super Food employees and officers, many of whom had also been employed by Parkview, testified that Super Food continued, after the merger, to do business with its suppliers and customers in the same manner that Parkview had. Consequently, Super Food sold merchandise to Munafo at the invoice price it paid its suppliers for the merchandise. Super Food, like Parkview, passed on to its customers, any vendor monies that were "off-invoice" or "published" allowances. According to the employees, Munafo never raised the issue of "cost plus" pricing.
Super Food, like Parkview, also received from suppliers vendor monies and advertising monies that were not passed on to its customers. These vendor monies were referred to as "unpublished" discounts or allowances that were not reflected in the invoice price submitted by the supplier to the wholesaler and were not, in turn, presented to the wholesaler's customer. This way of doing business between suppliers and wholesalers and wholesalers and customers was standard in the industry. Further, the percentage amount of the discounts or allowances Parkview and Super Food received from its suppliers was within industry standards.
Super Food, like Parkview, retained the vendor monies as profit and to defray costs. Unlike Super Food, however, Parkview was a cooperative, and its members received either cash or stock dividends, or shares in Parkview, at the end of the year. Super Food is a publicly held company, whose stockholders, which include the Munafo matriarch, receive either an increase or a decrease in the value of their shares of stock, depending on the market. Super Food, like Parkview, used its advertising monies to cover the cost of advertising not paid by the advertising fees collected from each store.
Some vendors that sold items directly to stores (without Super Food intervening by either warehousing and delivering the merchandise or allowing the vendor to bill the customer through Super Food) would provide individual stores with discounts or rebates. Super Food was not aware of the extent of such discounts.
Super Food changed the way Parkview had kept soft-drink advertising money when its customers could not be competitive with other stores. When soft drinks became a key advertising item in the Cincinnati area, Super Food passed on a portion of the advertising monies to its customers.
The delivery charge allocated to each store had been set by Arrighi. The fee was later renegotiated by Super Food individually with the storeowners.
Super Food's Cincinnati Division charged its customers the invoice price it paid the Super Food corporate office for supplies and private-label goods. The corporate office charged the other divisions, including Cincinnati, a processing fee that was reflected in the invoice price.
Super Food promised its customers that, based on volume purchasing, it could get the best price for merchandise. When Super Food discovered that suppliers were selling to its customers at lower prices, it would investigate, and, generally, it would discover that the merchandise was of lower quality or shorter date, or that the price was a mistake.
Other than IGA-labeled products, Munafo was free to purchase from a different supplier any merchandise that it could find for a lower price. Super Food's understanding of the parties' relationship was that either could walk away from doing business with the other at any time.
 VI. Munafo Testimony
Christopher Munafo, Munafo's corporate secretary, testified that he understood that some changes would occur when Super Food merged with Parkview, based on the fact that Parkview had been a cooperative and Super Food was not. He had no knowledge, however, of what specific changes were made. He had no knowledge of whether Parkview had received rebates or other monies from vendors whose products were placed in Parkview's advertisements. He had no idea how allowances or soft-drink monies had been passed through to Munafo by Parkview. His father had not explained any of the specifics of the arrangement Munafo had with Parkview. According to Christopher, his father was someone who kept everything in his head so that, when he died, the Munafo stores were "dropped" on the family. Christopher also testified that he had no personal knowledge of any changes Super Food made to the Parkview IGA program in the first several years after the merger.
Christopher testified that he believed the verbal agreement between Munafo and Super Food stood as long as the two parties were doing business, but that either party could walk away. He did not have the understanding that, to stay with Super Food, Munafo had to do business with Super Food's suppliers, except for IGA-labeled products. In fact, Munafo purchased produce, eggs, meat, supplies, and yogurt from suppliers outside Super Food's program, because it was able to get a lower price. He understood that Munafo's side of the agreement with Super Food was to pay for the products Super Food shipped to it, and to follow the IGA program for advertisements and other retailing procedures. It was his understanding that IGA was to prepare and place advertisements, and that Munafo would pay certain advertising fees, but he had no idea whether the fees were sufficient to pay for the advertising costs.
He knew that, in 1989, Super Food was not passing on to Munafo all the vendor monies and advertising monies. When he confronted a Super Food representative about this, he was told that it would be investigated. Super Food, however, did not agree to pass along any more monies. Munafo also talked to Super Food about doing its own advertisements in order to keep the advertising allowances paid by soft-drink companies and other suppliers. Super Food would not agree to this because Super Food's goal was to have all IGA stores on the same program. Christopher testified that, in 1989, Super Food changed its program to provide storeowners a percentage of soft-drink vendor monies.
He testified that he asked a Super Food representative why Munafo was being charged a higher delivery fee than another store's. He was told by a Super Food representative that the fees had been set by Arrighi. Christopher "believed" that Super Food had unilaterally raised the Munafo fee. Christopher testified that Munafo had looked at other suppliers beginning in the early 1990'. Munafo had decided not to switch because it wanted to keep the IGA name.
Nicholas Munafo, Jr., the treasurer of Munafo and the manager of the Carlisle store, testified that members of Parkview had shared in the revenues of the cooperative by way of a year-end dividend check. Sometime before the merger with Super Food, Parkview had become an IGA affiliate. He testified that he had never discussed the nature or details of the contractual relationship between Munafo and Parkview and that, after the merger, he never discussed the contractual relationship between Super Food and Munafo.
According to Nicholas, the Munafo family "understood" its relationship with Parkview to be on a "cost plus" basis. He explained that "cost plus" pricing was the lowest price for an item after all the discounts, allowances, rebates, percentages, and the like provided by the manufacturer, vendor, or broker had been subtracted, plus the delivery fee. He testified that, in his opinion, the price books that the Munafo stores received stated that the stores were paying cost plus a percentage. He believed that he got his understanding of "cost plus" from his father based on what Arrighi had told his father. Nicholas himself never spoke to Arrighi or anyone else at Parkview about "cost plus" pricing. He recalled that the term was "general knowledge." Nicholas stated that he had believed that Munafo was receiving "cost plus" pricing, but that he did not check every item against the price books.
Nicholas had no idea whether Parkview had received any advertising monies from suppliers or how advertising costs had figured into "cost plus" pricing." He had not discussed with his father how vendor monies might figure into "cost plus" pricing. He was unaware of his father complaining to Parkview about mispricing items or failing to pass on monies to storeowners. He was unaware of Parkview asking its members to assign discounts received from direct suppliers in order to defray advertising costs, as reflected in a 1978 letter.
Nicholas testified that Super Food never agreed to change the way it did business to address the Munafo concerns. Beginning in 1991, however, Super Food sent a letter to storeowners explaining that owners would receive 75% of the advertising support money from soft drinks and that Super Food would keep 25%. He did not have any reason to believe that the split was a secret at that time. He also knew in 1992 that some of the soft-drink monies were being split with the stores and that, in 1994, the monies were being divided evenly.
Nicholas testified that in the early 1990', while he was working at a non-IGA discount store supplied by Super Food, a Coca Cola representative offered him a discount if Nicholas would agree to display a Coca Cola product. Nicholas contacted Super Food and was informed by one person that the discount reflected marketing money, and by another that there was no money. A week later, however, Super Food offered him a smaller discount on a take-it-or-leave-it basis. Super Food subsequently offered all IGA stores the same smaller discount.
Nicholas testified that he complained to another Super Food employee about the cost of paper bags in relation to those available from another supplier. According to Nicholas, he was told that Super Food's higher price was due to the corporate office purchasing the bags and increasing the price to the warehouse, which then passed it along to storeowners. He also testified that he was able to get meat at a lower price from a different supplier.
 VI. Conclusion
Reviewing the evidence of record in a light most favorable to Munafo, we conclude that Munafo failed to present evidence showing that there was a genuine issue of material fact whether Super Food and Munafo had entered into an oral agreement (in addition to any written contracts) that Super Food would sell Munafo its products at a price that reflected the subtraction ofall rebates, allowances, and the like provided by the manufacturers/vendors, plus a delivery fee. The evidence shows that Super Food's Cincinnati Division promised to continue business with the IGA stores in the same manner that Parkview had, and that Super Food did not materially change Parkview's policies with respect to pricing, advertising monies, or delivery fees. At most, Munafo demonstrated that it gave one meaning to "invoice price," that Super Food had another, and that neither party knew or had reason to know the difference. Further, Munafo failed to raise a genuine issue of material fact concerning the failure of Super Food to obtain the best prices for its customers. The fact that at times a manufacturer, vendor or broker sold an item more inexpensively, or that Super Food's corporate office charged a fee to the Cincinnati Division, which was then passed on to the stores, did not establish that Super Food's overall products were not in the long run priced competitively. Furthermore, Munafo's evidence failed to raise a genuine issue of material fact concerning whether Super Food had committed fraud or whether it had been unjustly enriched.
Even if we assume for the sake of argument that the parties had entered into an oral contract that encompassed all their business dealings, we are persuaded that Munafo's continued course of dealing for at least a decade with knowledge of how Super Food conducted its business constituted a modification of the terms of that agreement. Either party could walk away from doing business with the other at any time. Munafo chose not to do so after being told that Super Food would not change its procedures to accommodate Munafo. Munafo stayed with Super Food to retain the business advantage of using the IGA name
Even though the trial court apparently based it summary judgment in favor of Super Food on "waiver," which we do not believe to be the proper term in this case, its entry of judgment as a matter of law judgment was correct. Because a trial court can be right for the wrong reasons,[11] we affirm the trial court's judgment.
Judgment affirmed.
 ____________________ PRESIDING JUDGE PAINTER
 SUNDERMANN and WINKLER, JJ., concur.
[1] Risch v. Friendly's Ice Cream Corp. (1999), 15 IER Cases (BNA) 1032, citing State ex rel. Howard v. Ferreri (1994), 70 Ohio St.3d 587,589, 639 N.E.2d 1189, 1192.
[2] Id., citing Dresher v. Burt (1996), 75 Ohio St.3d 280, 293,662 N.E.2d 264, 274.
[3] Gross v. Western-Southern Life Ins. Co (1993), 85 Ohio App.3d 662,667, 621 N.E.2d 412, 415.
[4] Id., quoting Mount v. Columbus Southern Ohio Elec. Co
(1987), 39 Ohio App.3d 1, 2, 528 N.E.2d 1262, 1263.
[5] Anderson v. Liberty Lobby, Inc. (1986), 477 U.S. 242, 247-248,106 S.Ct. 2505, 2510.
[6] Smiddy v. The Wedding Party, Inc. (1987), 30 Ohio St.3d 35,506 N.E.2d 212.
[7] Shepherd v. United Parcel Serv. (1992), 84 Ohio App.3d 634,643, 617 N.E.2d 1152, 1157.
[8] McCarthy, Lebit, Crystal Haiman Co., L.P.A. v. First UnionManagement, Inc. (1993), 87 Ohio App.3d 613, 620, 622 N.E.2d 1093,1097-1098.
[9] Restatement of the Law 2d, Contracts (1981), Section 17, Comment c.
[10] Restatement of the Law 2d, Contracts (1981), Section 20.
[11] Hall v. Gill (1995), 108 Ohio App.3d 196, 670 N.E.2d 503