[Cite as *Jackson Tube Serv., Inc. v. Camaco L.L.C.*, 2013-Ohio-2344.]

IN THE COURT OF APPEALS FOR MIAMI COUNTY, OHIO

JACKSON TUBE SERVICE, INC.     :

    Plaintiff-Appellee     :     C.A. CASE NOS. 2012 CA 19
                                                      2012 CA 25

v.     :     T.C. NO.    10-395

CAMACO LLC     :     (Civil appeal from
                                            Common Pleas Court)

    Defendant-Appellant     :

    :

. . . . . . . . . .

**O P I N I O N**

Rendered on the    7th    day of     June    , 2013.

. . . . . . . . . .

MATTHEW C. SORG, Atty. Reg. No. 0062971, 2700 Kettering Tower, Dayton, Ohio 45423
    Attorney for Plaintiff-Appellee

THOMAS M. GREEN, Atty. Reg. No. 0016361, 800 Performance Place, 109 N. Main Street, Dayton, Ohio 45402
    Attorney for Defendant-Appellant

. . . . . . . . . .

DONOVAN, J.

    **{¶ 1}** Defendant-appellant Camaco, L.L.C. (hereinafter "Camaco"), appeals a final

judgment of the Miami County Court of Common Pleas, General Division, finding Camaco in breach of contract and ordering it to pay damages to plaintiff-appellee Jackson Tube Service, Inc. (hereinafter "JTS"), in the amount $320,192.09, as well as post-judgment interest and court costs. The case proceeded to trial on January 18, 2012. On August 24, 2012, the trial court issued a decision granting judgment in favor of JTS. The trial court issued a final judgment entry on September 7, 2012. Camaco filed a timely notice of appeal with this Court on October 3, 2012.

{¶ 2} The parties involved in the instant appeal are JTS, a fabricator of steel products used in various manufacturing processes, and Camaco, a supplier of parts for the automobile industry. Between 2006 and 2009, JTS entered into a series of contracts with Camaco, wherein it agreed to supply the appellant with different sized rolled steel tubing to be used by third-party manufacturers to assemble automobile seating.

{¶ 3} In July of 2009, JTS informed Camaco that it would not release any more steel parts for shipment until it paid its outstanding invoices for parts that had already been delivered. Camaco responded by alleging that JTS had billed it for ten months at an inflated steel cost and that it would not pay any of the open invoices until JTS agreed to correct its steel pricing. JTS agreed to adjust the price for orders placed after June 9, 2009. Camaco believed that the price adjustment should have been applied retroactively by JTS, as well as prospectively, to any orders negotiated before June 9, 2009. JTS disagreed with Camaco's interpretation of their agreement and refused to release any more parts until it was paid for the existing invoices. Camaco refused to pay the existing invoices unless the prices were retroactively adjusted.

{¶ 4} On April 27, 2010, JTS filed a complaint alleging breach of contract and unjust enrichment based upon Camaco's failure to pay off the existing invoices. The claims included open past-due invoices for products sold without dispute, and a series of contracts identified by the project names Marianna, HB, P415, and 61206-I. On September 8, 2010, Camaco filed an answer and a counterclaim alleging breach of contract and damages to cover.

{¶ 5} The case was tried to the bench on January 18, 2012, after which both parties submitted closing memoranda detailing their respective positions. On August 24, 2012, the trial court issued a decision granting judgment in favor JTS and awarding damages in the following amounts: 1) $161,832.83 for the open invoices claim; 2) $31,982.88 for the HB claim; 3) $70,186.81 for the Marianna claim; 4) $29,817.89 for the P415 claim; and 5) $26,382.68 for the 61206-I claim, for an aggregate award of $320,192.09. The trial court also ordered Camaco to pay post-judgment interest and court costs, but ordered JTS to notify Camaco of any proceeds it received from the sale of any salvage it retained due to the appellant's breach. The proceeds from the sale were then ordered to be put toward the total judgment owed by Camaco. The trial court issued a final judgment entry on September 7, 2012.

{¶ 6} It is from this judgment that Camaco now appeals.

{¶ 7} Camaco's first assignment of error is as follows:

{¶ 8} "THE TRIAL COURT ERRED BY HOLDING CAMACO RESPONSIBLE FOR THE RISK OF OVERPRODUCTION RELATED TO THE HB AND MARIANNA CONTRACTS."

{¶ 9} In its first assignment, Camaco contends the HB and Marianna contracts

were "requirement contracts," and therefore, JTS bore responsibility for the cost associated with the overproduction of any steel parts it produced pursuant to either contract.

{¶ 10}  In its most basic form, a contract is generally defined as "a promise, or a set of promises, actionable upon breach.  Essential elements of a contract include an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration." *Minster Farmers Coop. Exchange Co., Inc. v. Meyer,* 117 Ohio St.3d 459, 2008-Ohio-1259, 884 N.E.2d 1056, at ¶28.

{¶ 11}  A meeting of the minds as to the essential terms of the contract is a requirement for enforcing the contract. *Episcopal Retirement Homes, Inc. v. Ohio Dept. of Indus. Relations*, 61 Ohio St.3d 366, 369, 575 N.E.2d 134 (1991).  "In order for a meeting of the minds to occur, both parties to an agreement must mutually assent to the substance of the exchange." *Miller v. Lindsay-Green, Inc.,* 10th Dist. Franklin No. 04AP-848, 2005-Ohio-6366, at ¶63.  See, also, *Zelina v. Hillyer*, 165 Ohio App.3d 255, 2005-Ohio-5803, 846 N.E.2d 68, at ¶12 (9th Dist.) (stating that a meeting of the minds occurs if "a reasonable person would find that the parties manifested a present intention to be bound to an agreement").  The parties must have a distinct and common intention that is communicated by each party to the other. *McCarthy, Lebit, Crystal & Haiman Co., L.P.A. v. First Union Mgt., Inc.*, 87 Ohio App.3d 613, 620, 622 N.E.2d 1093 (8th Dist.1993).

{¶ 12}  The Ohio Supreme Court, in *Fuchs v. United Motor Stage Co.*, 135 Ohio St. 509, 21 N.E.2d 669 (1939), at ¶ 2, defined a requirements contract as follows:

A contract in writing whereby one agrees to buy, for sufficient consideration,

*all the merchandise of a designated type* which the buyer may require for use in his own established business.

{¶ 13}   A requirements contract has further been defined as a contract in writing where one party promises to buy exclusively, and the other party agrees to deliver specific goods or services which the buyer may need for a certain period of time. *Bass, Hurwitz & Poliner, CPA's v. State of Ohio*, 10th Dist. Franklin No. 88AP-1120, 89AP-16, 1989 WL 87078 (August 3, 1989).

{¶ 14}   With respect to the HB and Marianna claims, both contracts were negotiated through a purchase order issued by Camaco to JTS for a certain number of parts or a blanket order for an uncertain number of parts.  Marcus Sergy, vice president of finance for JTS, testified that a blanket order is simply a purchase order from the buyer, in this case Camaco, for a specific part at a specific price, but not a specific quantity.  Joe Patterson, sales coordinator at JTS, testified that after receiving the blanket order, JTS employees would attempt to estimate and plan the necessary steel requirements to complete the job.  Patterson called this process "forecasting."  Sergy further testified that Camaco would determine the specific quantities of steel tubing it required as time went on through a series of releases issued to JTS.  JTS would then produce the specific number of parts requested pursuant to the release.  The specific number of parts is referred to as the "firm" number.  The releases issued by Camaco to JTS contained both forecast and firm information.  The time it takes for JTS to produce the parts from the raw material stage to the finished product is called "lead time."

{¶ 15}   Production of the parts in the HB and Marianna claims was performed by

JTS pursuant to the releases transmitted by Camaco which contained the types and amounts of the parts to be manufactured by JTS. The releases were broken down by week and covered up to nine weeks in the future. The first two weeks in each release contained "firm" numbers, and the remaining seven weeks contained "forecast" numbers. The forecast numbers changed frequently because the parts produced by JTS were subject to the demands of different automobile manufacturers or their various subcontractors. The evidence adduced at trial established that on occasion, the firm numbers changed from one week to another. Eventually, Camaco sought to cancel the HB and Marianna contracts with JTS because the manufacturers who requested the parts no longer needed them. As a result, JTS was left with obsolescent parts it manufactured pursuant to the firm and forecast releases issued by Camaco. When JTS sought to be reimbursed for the obsolescent parts it produced pursuant to the HB and Marianna contracts, Camaco denied any responsibility and refused to pay for the parts it says were produced in excess of what it required.

{¶ 16} Initially, we conclude that neither the HB claim nor the Marianna claim were requirement contracts. In *NSK Industries, Inc. v. Bayloff Stamped Products Kinsman, Inc.*, 9th Dist. Summit No. 24777, 2010-Ohio-1171, the Ninth District Appellate Court found that the "Ohio Commercial Code permits buyers and sellers to enter into requirements contracts in which the parties agree to measure the term of their agreement by either a seller's [total] output or a buyer's requirements *rather than by a specific quantity*." *Id*. at ¶ 23. Accordingly, the Ninth District held that because the contract between NSK and Bayloff was for specific quantities of goods, specific parts, and specific prices, the contract was not a requirement contract.

{¶ 17} In the instant case, the record establishes that the HB and the Marianna contracts contemplated specific quantities of steel tubing products. Camaco was not requesting all of the parts that JTS could generate. Similar to the contracts at issue in *NSK*, blanket purchase orders were issued by Camaco in both the HB and Marianna contracts. Specific quantities of goods to be produced and assembled, however, were quoted to JTS from Camaco in the releases specific to each contract. Moreover, the exclusivity element necessary in requirement contracts was not present in either the HB or the Marianna claims. Specifically, JTS was free to sell steel tubing products to any other buyer during the term of the HB and the Marianna contracts. Conversely, Camaco was free to buy steel tubing products from any other seller during the term of either contract. Contrary to the assertions made by Camaco, the HB and Marianna claims were not requirement contracts, and the burden to establish by a preponderance of the evidence that JTS breached the contracts belonged to Camaco. Camaco failed to meet that burden.

{¶ 18} Joe Patterson testified that all of the steel products produced by JTS for the HB and Marianna contracts were manufactured inside the "firm" dates set by Camaco. Patterson further testified that there were no product overbuilds and that no products were assembled past the firm dates. The trial court found Patterson's testimony to be credible. Dan Wickett, corporate purchasing buyer for Camaco, testified that parts produced and released under a "firm" date should be paid off. Significantly, Camaco adduced no evidence at trial that any of the goods produced and assembled by JTS for the HB and Marianna contracts were produced outside the "firm" dates set forth in the releases. Thus, the trial court did not err when it found that Camaco was responsible for payment of the HB and Marianna claims.

{¶ 19}  Camaco's first assignment of error is overruled.

{¶ 20}  Camaco's second assignment of error is as follows:

{¶ 21}  "THE TRIAL COURT ERRED BY NOT DEDUCTING THE FUEL PREMIUM CHARGE, FREIGHT CHARGE, AND STEEL PRICE DISCOUNTS CLAIMED BY CAMACO FROM JTS'S OPEN INVOICES CLAIM."

{¶ 22}  In its second assignment, Camaco argues that it was entitled to setoff of the fuel premium charge, freight charge, and steel price discounts from JTS's open invoices claim.   Specifically, Camaco asserts that it was entitled to an additional setoff of $2,848.65 for the improper charges from JTS's open invoice claim of $161,832.83, leaving Camaco's obligation on the open invoice claim to be the reduced sum $158,984.18.   Camaco disputes the fuel and freight charges applied by JTS to Invoice #348171.

{¶ 23}  Patty Jo DeMarco, materials planner and buyer for Camaco, testified that the Invoice #348171 contained a fuel and freight charge applied by JTS.   DeMarco testified as follows:

> Q: Okay.   Looking back at this invoice real quickly, *and I know that you said you didn't have much knowledge on it,* which was 348171; I don't know if you still have that in front of you or not.
>
> DeMarco: Yes I do.
>
> Q: What was the normal shipment process for the, the parts that came to Camaco from Jackson Tube?   You guys retrieved, is that fair to say?
>
> A: Yes.
>
> Q: Okay.   We didn't – Jackson Tube didn't bring a truck to your little –

Camaco Lorain and go to your loading dock? You came to us and picked it up?

A: Only if Jackson Tube was late on the product, they would be in charge of shipping, yes.

Q: Okay but generally, my point was, Camaco retrieved?

A: Yes.

Q: FOB right? Okay. Why would this [Invoice #348171] have been sent to Wright Brother's Airport?

A: Sent where?

Q: Wright Brother's Airport.

Defense Counsel: I, I – I don't know if it's fair to object, but I don't think it says that?

DeMarco: Yes, it does.

Plaintiff's Counsel: Look to the right of your –

DeMarco: It does.

The Court: The objection is overruled.

DeMarco: I am going to say, me looking at this, that would say that I was in a shut down situation; we [Camaco] didn't have the material, and we were shut down and Jackson had to get it to me –

Q: Okay.

A: – quicker than the three and a half hours it would have taken to truck it –

Q: Okay, we don't –

A: – by looking at this.

Q: We don't know from the look of that who's, I guess, fault that was, do we?

A: I couldn't – I couldn't honestly say by looking at this, no.

Q: Okay, *so that fuel charge, if you* – [JTS] *had to get it down to the airport, that was something that would have been a normal charge in this abnormal situation?* You said shut, I take it that didn't happen very often, right?

A: No it didn't.

**{¶ 24}** DeMarco's testimony regarding Invoice # 348171 establishes that the fuel and freight charges were assessed to Camaco because JTS was required to, in this rare instance, arrange the delivery of the parts in an expedited manner since Camaco was in a "shut down situation." Under normal circumstances, Camaco would retrieve the finished parts from JTS's facility and there would be no fuel/freight charge applied to the invoice. In the extraordinary event of a shut down, JTS was required to arrange for delivery of the parts, as it did with respect to Invoice # 348171. Thus, it was not improper for JTS to apply the fuel and freight charges to Invoice # 348171, and Camaco was not entitled to setoff of those amounts.

**{¶ 25}** Regarding Camaco's argument that it was entitled to a steel price discount on JTS's Open Invoice claim, evidence adduced at trial does not support retroactive application of the steel price adjustment. Significantly, Dan Wickett, Camaco corporate buyer, specifically testified that JTS never agreed, orally or in writing, to retroactively apply the price adjustment executed on June 9, 2009. Additionally, there is no evidence in the

record to support Camaco's assertion that it was entitled to the price adjustment for parts that were *shipped* after June 9, 2009, even if said parts were ordered prior to that date. Therefore, Camaco was not entitled to any type of retroactive steel price adjustment, and the trial court did not err by refusing to apply the additional requested deductions from JTS's Open Invoice claim.

{¶ 26} Camaco's second assignment of error is overruled.

{¶ 27} Camaco's third assignment of error is as follows:

{¶ 28} "THE TRIAL COURT ERRED WHEN IT FOUND THAT JTS JUSTIFIABLY WITHHELD SHIPMENT OF PARTS RELATED TO ITS P415 AND 61206-I CLAIMS."

{¶ 29} In it third assignment, Camaco argues that JTS unjustifiably withheld shipment of parts with respect to the P415 and 61206-I claims. Camaco does not dispute that JTS withheld delivery of the parts because of its failure to pay the Open Invoices, including the HB and Marianna claims. Nevertheless, Camaco asserts that it had no duty to pay when JTS "unilaterally decided to withhold delivery [on the P415 and 61206-I claims] because it had cause to dispute or deny the amounts claimed by JTS for its open invoices."

{¶ 30} Upon review, the record supports the trial court's finding that Camaco refused to pay the Open Invoices because JTS would not acquiesce to its demand for a retroactive price adjustment that was neither discussed or agreed when the parties initially negotiated the various steel contracts. Simply put, Camaco created the dispute it is now attempting to take advantage of by claiming that it had no obligation to pay the invoices for which it had already received the steel parts.

{¶ 31} When reasonable grounds for insecurity arise with respect to the performance of either party, the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return. R.C. 1302.67(A). On July 9, 2009, Joe Patterson sent a demand letter to Dan Wickett at Camaco via email. In the demand letter, Patterson pointed out that Camaco had failed to pay in excess of $160,000.00 regarding the open invoices. Wickett responded that Camaco was entitled to retroactive price adjustments on the open invoices although said adjustment had not been agreed to orally or in writing. At this point, Camaco was in breach of contract, and pursuant to R.C. 1302.77(A), the aggrieved party, JTS, had the right to withhold delivery of goods when the other party failed to make the requisite payments or otherwise breached the contract. The record establishes that JTS waited a commercially reasonable time for performance by Camaco. JTS was not obligated to continue to supply parts to Camaco without payment on prior contracts or some other assurance of payment. Thus, the trial court did not err when it found that JTS justifiably withheld shipment of parts with respect to the P415 and 61206-I claims.

{¶ 32} Additionally, because Camaco was responsible for the breach and JTS rightfully withheld shipment, Camaco was not entitled to be reimbursed by JTS for the expenses it incurred to procure cover parts. Pursuant to R.C. 1302.85, for a buyer to cover under the Uniform Commercial Code (U.C.C.), there must be a breach of contract by the seller. In the instant case, the seller (JTS) did not breach the contract. Rather, Camaco created the breaching condition in an attempt to leverage a retroactive price adjustment to

which it was not entitled. Under these circumstances, Camaco is not entitled to cover under the express terms of the U.C.C. and R.C. 1302.85.

{¶ 33} Camaco's third assignment of error is overruled.

{¶ 34} Camaco's fourth assignment of error is as follows:

{¶ 35} "THE TRIAL COURT ERRED BY PERMITTING JTS TO APPLY THE SALVAGE VALUE OF THE PARTS SOLD AFTER JUDGMENT, RATHER THAN CALCULATING THE SALVAGE VALUE FROM THE PRICE OF STEEL AT THE TIME CAMACO REFUSED TO PAY THE ERRONEOUS INVOICES, OR THE DATE OF TRIAL."

{¶ 36} In its fourth assignment, Camaco argues that the date of salvage determined by the trial court was error. The trial court ordered JTS, within thirty days of entry of the final judgment, to sell for salvage value all of the completed parts that were retained under contract with Camaco. After deducting the actual costs incurred from the salvage proceeds, JTS was ordered to apply said salvage proceeds as a credit towards the total damage award owed by Camaco. Camaco asserts that the date(s) that the trial court should have utilized for valuation of the salvage is that date it refused to pay the open invoices, or in the alternative, the date the actual trial began in the instant case.

{¶ 37} Other than its bare assertion that the trial court erred in determining the date of salvage, Camaco provides no evidence that it was prejudiced by the court's chosen date of valuation. In our view, the steel parts remaining in JTS's possession were only considered salvage once the trial court issued its final judgment entry which found the parts to be salvage.

{¶ 38} Camaco's fourth assignment of error is overruled.

{¶ 39} In its fifth and final assignment of error, Camaco contends that the trial court erred when it overruled its motion for new trial.

{¶ 40} Initially, we note that Camaco's motion for a new trial was filed on September 20, 2012. On October 3, 2012, however, Camaco filed its notice of appeal of the trial court's final judgment entry issued on September 7, 2012.

{¶ 41} App.R. 4(B)(2) provides an exception to the thirty-day window for an appeal from a final judgment. With respect to a motion for a new trial under Civ. R. 59, App.R. 4(B)(2)(b) provides that the time for filing a notice of appeal from the judgment would begin to run when the trial court entered an order resolving the motion for a new trial.

{¶ 42} Camaco filed its notice of appeal on October 3, 2012. The trial court issued a decision overruling Camaco's motion for new trial on November 28, 2012. Prior to that date, Camaco could have asked this Court to remand the matter to the trial court in order to resolve the motion for new trial and stay the appellate proceedings. Camaco did not take advantage of the procedural mechanism afforded it under App.R. 4(B)(2)(b).

{¶ 43} "An appeal is perfected upon the filing of a written notice of appeal. R.C. 2505.04. Once a case has been appealed, the trial court loses jurisdiction except to take action in aid of the appeal. *State ex rel. Special Prosecutors v. Judges, Court of Common Pleas*, 55 Ohio St.2d 94, 97, 9 O.O.3d 88, 378 N.E.2d 162 (1978). The trial court retains jurisdiction over issues not inconsistent with the appellate court's jurisdiction to reverse, modify, or affirm the judgment appealed from. *Id*.; *Yee v. Erie Cty. Sheriff's Dept.*, 51 Ohio St.3d 43, 44, 553 N.E.2d 1354 (1990). *** Furthermore, the determination as to the

appropriateness of an appeal lies solely with the appellate court." *In re S.J.*, 106 Ohio St.3d 11, 12-13, 2005-Ohio-3215, 829 N.E.2d 1207, at ¶9-10. Accordingly, when Camaco filed its notice of appeal on October 3, 2012, the trial court was divested of jurisdiction to rule on the motion for new trial filed on September 20, 2012, and its decision was, therefore, a legal nullity.

{¶ 44}  Camaco's final assignment of error is overruled.

{¶ 45}  All of Camaco's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . .

HALL, J. and WELBAUM, J., concur.

Copies mailed to:

Matthew C. Sorg
Thomas M. Green
Hon. Christopher Gee